Robert CUNNINGHAM, Plaintiff,

v.

Daryl GATES, et al., Defendants.

Armand SOLY, et al., Plaintiffs,

v.

Daryl GATES, et al., Defendants.

Nos. CV96–2666 JSL, CV96–4157 JSL.

United States District Court,
C.D. California.

Dec. 16, 1997.

---

Stephen Yagman, Marion R. Yagman, Yagman & Yagman, P.C., Venice, CA, Richard H. Millard, Los Angeles, CA, Joseph Reichmann, Westwood, CA, Kathryn S. Bloomfield, Studio City, CA, Edward F. Figaredo, El Monte, CA, for plaintiffs.

Cory Brent, Deputy City Attorney, Los Angeles, CA, Louis R. Miller, Christensen, White et al., Los Angeles, CA, Russell Sauer, Special Master, Lathan & Watkins, Los Angeles, CA, for defendants.

## ORDER RE MOTIONS OF PUBLIC OFFICIAL DEFENDANTS FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

LETTS, District Judge.

Before the court are motions for summary judgment in the above-referenced cases. The motions are brought by the Los Angeles Police Chief, certain supervisory officers of the Los Angeles Police Department ("LAPD" or "Department") and members of the Los Angeles Police Commission ("police policy-making defendants"), members of the Los Angeles City Attorney's office ("attorney defendants") and the Los Angeles City Council ("council member defendants"), and the Mayor of Los Angeles. Collectively the moving defendants are referred to as the "public official defendants." All of the motions are based upon claims of qualified immunity.

The various plaintiffs' claims to which the motions are directed arise out of the same incident (the *"Cunningham"* incident). They pose common questions of law and fact as to each of the public official defendants. For clarity of reference, therefore, all of the cases are referred to herein as a single case.

### INTRODUCTION

Before deciding these motions, the court has considered and decided motions for summary judgment filed by other defendants, *viz.*, members of the Special Investigative Services ("SIS") unit of the LAPD (the "SIS officers' motions").

In deciding the SIS officers' motions, the court determined that there will be evidence at trial upon which a reasonable juror might (a) reject the officers' versions of the incident in question as untruthful; (b) conclude that the *Cunningham* incident is one of a series of incidents which represent a continuing course of conduct by SIS officers; and (c) conclude that one of the common elements of this course of conduct is the falsification of documents and testimony by SIS officers for purposes of concealment.

Plaintiffs contend that all of the public official defendants are aware that SIS officers, like all LAPD officers, adhere to an "officer code of silence," by which they will support each others' untruthful versions of events relating to the use of force, and that the public official defendants knowingly maintain policies that encourage the officers in this behavior. *See* Third Amended Complaint at 12–15. Plaintiffs also contend that all of the public official defendants knowingly maintain policies that intentionally ignore the officer code of silence, assume the truthfulness of officer versions of use of force events, and unfairly discount or ignore all impeaching evidence, both for disciplinary and indemnitory purposes, with the result that police officers are rarely, if ever, held accountable in any way for unconstitutional acts of excessive force. Plaintiffs also contend that the SIS officers knowingly rely on these policies and practices in committing their unconstitutional acts. *Id.*

These are very serious allegations. If they are supported by *any* substantial evidence, they strike at the very core of the rule of law upon which this democratic society is based. It makes a mockery of the phrase "a nation of laws, not men" if those entrusted with the enforcement of the laws cannot be trusted to tell the truth about the facts to which the laws are to be applied. If, indeed, the citizens of Los Angeles cannot trust police officers always to tell the truth when under oath, but rather must trust the officers' judgment about *when* to tell the truth under oath, due process of law in this City is not due process, and equal protection is not equal.

Rationalizing, by claiming that officers are untruthful only when necessary to protect themselves from unjustified attacks made upon them by unscrupulous lawyers representing lying, lowlife clients, cannot justify the conduct. Who decides which lawyers are unscrupulous, and which clients are lowlifes? If society tolerates untruthfulness by police officers for any purpose, how does it know that it is used only for that purpose? If untruthfulness by police officers is to be justified because it serves some other "higher purpose," who decides what purpose is "higher," and on what basis is that decision made?

## NATURE OF THE CASE

The complaints reveal that the plaintiffs intend to rely on at least three other specific incidents for the purpose of establishing the alleged common course of conduct: *"Smith,"*[1] *"Gomez"*[2] and *"Berry"*[3] (collectively along with *Cunningham,* the "robbery incidents").[4] In deciding the SIS officer motions, the court has held that evidence concerning the robbery incidents will be admissible at trial to prove the existence of the alleged common course of conduct.[5]

1. The *"Smith"* incident has resulted in three lawsuits, *Grover Smith, et al. v. Daryl Gates, et al.,* Case No. CV 97–1286 JSL, *D. Lyons, et al., v. Daryl Gates, et al.,* Case No. CV 97–1836 JSL, *G. Nicoletti, et al. v. Daryl Gates, et al.,* Case No. CV 97–2377 JSL.

2. The *Gomez* incident resulted in the lawsuit *Julia Gomez, et al. v. Daryl Gates, et al., Case No. CV 90-856 JSL.*

3. The *Berry* incident resulted in the lawsuit *Jane Berry v. Daryl Gates, et al.,* Case No. CV 89–7381 SVW.

4. The court is aware of two other incidents, both occurring in 1997, in which complaints filed in the United States District Court allege essentially the same course of conduct. Although they were filed by one of the counsel for plaintiffs here, the papers as yet do not suggest that the plaintiffs here will rely on these later incidents in proving their case.

5. Defendants' attempts to portray each of the incidents as isolated instances by including them in statistics covering all of the SIS surveillance operations have not been persuasive. There is no reason to believe that any substantial number of the surveillances included in these statistics have any substantial similarity to cases involving

The evidence shows that numerous officers observed the shootings in each of the robbery incidents. Only one robber survived each incident.[6] There were no independent eye-witnesses to any of the shootings. The court has no reason to believe that these circumstances are atypical in situations involving the alleged use of excessive force. One would hardly expect police officers to look for opportunities to use excessive force where independent eye-witnesses are present. Conversely, for a variety of reasons, one would not be surprised to find that other officers were present in most situations involving the alleged use of excessive force.

It requires no legal training to understand that, so long as the various officers corroborate each other as to essential facts, their testimony is almost certain to be accepted as true as to those facts, almost regardless of major inconsistencies or of the inherent incredibility of some aspects of the testimony. Indeed, in any individual case, a reasonable jury could make a liability determination in favor of plaintiffs, based upon the rejection of the officers' testimony as untrue, only in the remote event that the testimony, including that of corroborating officers, was fatally impeached by other evidence.[7]

robbers "caught in the act." Similarly, defendants' attempts to show that the "jam" technique used for cornering suspects in their cars is routinely used, with very rare need for the use of force, have not been persuasive. Defendants have offered nothing but their own bare word to support this claim. They offer no information concerning how many of those jammed were "caught in the act" of a crime. The court presumes that relatively few of the successful jams fit this description. Otherwise the question would arise why the crimes were occurring so frequently, if it the police were not intentionally allowing the crimes to occur.

6. One "robber," was not, in fact, a robber. He was an uninvolved person shot by an SIS officer, apparently in the mistaken belief that he was a robber.

7. Without doubt, plaintiffs' primary tactic in this regard will be to try to impeach the officers with their own testimony. They will try to demonstrate to the jury that SIS officer claims that events common to all of the allegedly common incidents were "unavoidable," while arguably credible *as applied to any one of the incidents,* are incredible as applied to all four. Equally without doubt, plaintiffs will try to show that in

In such circumstances, it reaches near the height of naivete—or of tunnel vision—to accept the oft-repeated claim that the fact that LAPD officers are rarely held liable for acts of excessive force proves they rarely commit them, or that most of such claims are brought by unscrupulous lawyers or clients.[8]

Plaintiffs contend that the public official defendants deliberately ignore these matters. They contend that there is a tacit understanding shared by all of the public official defendants that LAPD officers are not to be punished in any way for acts of excessive force. According to plaintiffs, even when juries have clearly concluded that LAPD officers have testified untruthfully at civil rights trials, the public official defendants proceed on the contrary presumptions that the officers were truthful and that the juries were wrong. Plaintiffs argue that the evidence shows that SIS officers' explanations of their need to use deadly force—no matter how incredible when taken against the totality of the evidence—are always accepted as true for all purposes in relation to Department discipline and personal financial responsibility to the victims of their unconstitutional acts. Third Amended Complaint at 7–8; *see also* Memorandum of Points and Authorities in Opposition to Defendant City Council Members' and Mayor's Motion for Summary Judgment ("Opposition") at 3–5.

## THE CHRISTOPHER COMMISSION REPORT AND THE OFFICER CODE OF SILENCE

Plaintiffs contend that the principal polices of which they complain are identified in the Report of the Independent Commission on the Los Angeles Police Department (the "Christopher Commission Report"). They further contend that nothing of substance has been done to change these policies since the Christopher Commission Report was released.

The Christopher Commission Report was released in 1991. The Christopher Commission was formed in the wake of the Rodney King police beating incident to study the problem of excessive force in the LAPD. It identified a number of official policies and practices that contributed to this problem. The public official defendants have not argued that the findings of the Christopher Commission were erroneous, or that they have been changed in the time that has elapsed since the Report was released. They have argued instead that the Christopher Commission Report is irrelevant. The same argument was made on the same basis on behalf of the same defendants in the civil rights case that followed the *Gomez* incident. It was rejected by the district court and is also rejected by the court in this case.[*] By electing to proceed on the basis that the Christopher Commission Report is irrelevant, the public official defendants have left plaintiffs' contentions based on the Christopher Commission Report unrebutted.

The two policies on which plaintiffs rely primarily are (a) the alleged continuing refusal by the public official defendants to do anything about what the Christopher Commission refers to as the "officer code of silence," and (b) the policy of accepting officer versions of excessive force events as true

each of the allegedly common incidents, SIS officers have deliberately falsified documents and given perjured testimony to support each other.

Obviously, however, in a circumstance in which plaintiffs' chance of success will depend almost entirely on their ability to impeach the officers by showing that their testimony is untrue, plaintiffs cannot disclose how they intend to do this with too much specificity. The court is also constrained from doing so both for fear of disclosing too much of plaintiffs' case, and for fear of helping plaintiffs to make their case. Suffice it to say here that in deciding the SIS officer motions, the court determined that, notwithstanding the apparent lack of positive evidence to support the plaintiffs' claims, there would be enough impeachment evidence for the case to go to the jury.

8. The lawyers, of course, are limited to a "reasonable fee" for cases in which they prevail. They receive no fee when they do not prevail. It is difficult to see how many lawyers could expect to make a living by bringing cases based solely on the hope that lies told by their clients would be believed over truth told by police officers.

* As originally published, the opinion reflected the court's erroneous belief that the *Gomez* case was appealed and affirmed in an unpublished opinion.

over other more credible evidence to the contrary.[9]

The Christopher Commission Report uses the term "officer code of silence" and describes it as follows: "[I]t consists of one simple rule, an officer does not provide adverse information against a fellow officer." Christopher Commission Report at 168. The Report makes clear that the existence of the officer code of silence was well-known to high-ranking LAPD even before the Report was released. *Id.* at 169–170. The discussion shows that officers not only refuse to give adverse information against each other, they also testify untruthfully under oath to avoid doing so. *Id.* Although the Report states that a small but significant number of "bad cops" account for most cases of excessive force, *id.* at ix–x, it also makes it clear that all cops, including "good cops," adhere to the code of silence, even when the result is to protect "bad cops" from the consequences of their acts. *Id.* at 168–170. In consequence, the Christopher Commission Report describes the code of silence as "[p]erhaps the greatest single barrier to the effective investigation and adjudication of complaints." *Id.* at 168.

The Christopher Commission Report also indicates that, in investigating incidents of alleged excessive force, the LAPD relies far too heavily on the versions given by the officers, discounts far too readily the versions of other witnesses, and does not avail itself of opportunities to obtain information which might provide insights into the truth of the relevant events. *Id.* at 155–164.

The Christopher Commission Report shows that only 3% of all citizen complaints against LAPD officers are classified as "sustained" for disciplinary purposes. *Id.* at 153. It also shows that citizen complaints cannot be classified as "sustained" if there is corroborating evidence from "uninvolved" officers. *Id.* at 155, 163.[10] Plaintiffs contend that the evidence makes clear that nothing of substance has been done since the release of the

Christopher Commission Report either to eliminate the code of silence or to consider its effects upon decisions made either for disciplinary or indemnificatory purposes.

## QUALIFIED IMMUNITY STANDARD

■ "Government officials who perform discretionary functions are protected from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lum v. Jensen,* 876 F.2d 1385, 1386 (9th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

The threshold determination of whether the law is clearly established is a question of law for the court. [Citations]. The second part of the test, whether a reasonable state official could have believed the action taken was lawful, is a mixed question of law and fact. It involves an objective test of whether a reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took. If there are genuine issues of material fact in issue relating to the historical facts of what the official knew of what he did, it is clear that these are questions of fact for the jury to determine. *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 70 F.3d 1095, 1099 (9th Cir.1995).

■ The law is clearly established that an official is liable in his individual capacity if he "set[ ] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict constitutional injury." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991). The official can be held liable even if his "acts" consist of mere acquiescence to the unconstitutional acts or culpable conduct with respect to the "training, super-

---

**9.** The discussion of both of these policies is found in Chapter 9 of the Report.

**10.** The Report makes clear that a different investigatory procedure is used with regard to shooting incidents, but does not suggest that the re-

sults are substantially different. Even if they were, a jury might consider what is done with regard to non-shooting incidents—which are the great majority—as evidence of the existence of the policy.

vision, or control of his subordinates." *Id.* Proof of plaintiffs' allegations that the public official defendants knowingly refused to change policies or practices that made it possible for SIS officers to engage in continuing course of unconstitutional conduct with complete impunity from any adverse consequences as the result of their actions, constitute proof of violation of clearly established law.

■ Under *Sinaloa*, the question of whether a "reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took," is a question for the jury, unless, as a matter of law on the basis of undisputed facts, the court can conclude that a reasonable official with the knowledge possessed by the public official defendants would have known that his conduct was unlawful.

■ This is an objective standard. A conclusion by the court that a jury could find that a reasonable public official would have known that his conduct was unlawful, does not connote that a jury would find that any of the public official defendants actually knew that their conduct was unlawful, or any opinion of the court concerning such conduct.[11]

### POLICE POLICY–MAKING DEFENDANTS

■ The police policy-making officials are responsible for establishing the policies and practices of the Department. The court holds that the jury may find, on the basis of the Christopher Commission Report and of both positive evidence and lack of contrary evidence that there has been no change, that the officer code of silence and the preference for believing officer versions of excessive force incidents over other more credible evidence have existed continuously from the date of release of the Christopher Commission Report. A jury could also find that if excessive force was used by the SIS officers in this case, there is a causal connection between these policies and the use of force against Cunningham and Soly.

Plaintiffs contend that after the publication of the Christopher Commission Report, no "reasonable official could have believed that his conduct was lawful" if he did not take action within his power to bring about effective change. Plaintiffs contend that all of the evidence before the court suggests that, even after the Christopher Commission Report, none of the police policy-making officials have done anything of substance to eliminate the officer code of silence or to cure the manner in which it renders officers who use excessive force immune from any consequence. They contend that after the Christopher Commission Report, no reasonable official could have behaved in this manner and believed that his conduct was lawful.

It is not for the court to agree or disagree with plaintiffs' contentions concerning the police policy-making defendants. It is necessary only to conclude that if a jury reached a verdict against the SIS officers that rested on the jury's conclusion that SIS officers have engaged in a common course of unconstitutional conduct, which includes officer corroboration of false versions of the relevant events, a jury question would be presented as to the police policy-making defendants. For this reason, the motions of the police policy making defendants must be DENIED.

### ATTORNEY DEFENDANTS

■ The court finds it particularly difficult to consider the possibility that the attorney defendants may be held responsible for the policies of which plaintiffs complain. The court recognizes that attorneys must be protected from unfounded lawsuits. Disgruntled parties often are unhappy with the way opposing lawyers represent their clients. Lawyers are not properly sued solely for this reason. The court also recognizes that some of the lawyers in this case have a long and antagonistic history together, for which it is difficult to assess relative blame. If it appeared to the court that this action was brought against the attorney defendants as

---

**11.** The evidence suggests that there may well be differences in the individual acts, and the state of knowledge and mind, among various individuals included in the various groups of defendants discussed herein. No defendant, however, has raised any such individual differences for purposes of deciding these motions.

an expression of the antagonism of one lawyer for others, it would not be countenanced.

Lawyers who knowingly aid and abet their clients' unlawful acts beyond the bounds of fair representation, however, enjoy no special privilege. Plaintiffs allege, in essence, that all of the public official defendants knowingly rely on the fact that the attorney defendants will defend the City and the officers from liabilities stemming from excessive force incidents, and will shield the public official defendants by allowing them to purport to act on recommendations based on factual descriptions known to be inaccurate, and legal conclusions known to be erroneous.

The Christopher Commission Report contains only an indirect suggestion of the attorney defendants' alleged role in assuring police officers that they will not be held accountable for acts of excessive force. The Report states that both the City Attorney and Police Chief agreed that the LAPD lacks effective procedures for reviewing the results of civil litigation involving LAPD officers. The Report concluded:

> Given the millions of dollars paid by the City as a result of use of force by LAPD officers, and the egregious conduct revealed in some of the lawsuits, the Department must establish procedures to monitor the results of civil litigation and make use of the information obtained.

Christopher Commission Report at 60. The Christopher Commission went on to recommend the following to address this problem:

> LAPD management must recognize that the problem of litigation is a reflection of the more fundamental problem of excessive force, not in all cases to be sure, but in far too many of them. Prompt investigation and discipline, if appropriate, should be pursued. Information about officers' conduct that becomes available in the litigation should be used in evaluating those officers. Conduct that results in large settlements or judgments, including punitive damages awarded on the basis of egregious or intentional misconduct, should be carefully studied to determine what went wrong and why.

*Id.* at 63.

Plaintiffs allege that this failure to use information generated in the course of civil rights cases from disciplinary and other purposes is not merely a matter of poor management, but rather of conscious policy established or acquiesced in by all of the public official defendants for their own benefit. They further allege that nothing has been done since the Christopher Commission Report to carry out that recommendation.

Plaintiffs contend that the evidence shows that the role of the attorney defendants is far more crucial to the unconstitutional course of conduct engaged in by the SIS officers than is suggested by the Christopher Commission Report. Plaintiffs contend that the attorney defendants in fact play the most critical role in the unconstitutional policy of indemnification with which they charge the council member defendants.

Plaintiffs allege that the council member defendants have pursued their unlawful policy of indemnification both through settlements of punitive damages awarded against officers without any payment by officers, and by indemnifying them from punitive damage awards by vote, pursuant to Cal. Gov.Code. § 825(b). Plaintiffs allege that the existence of the unconstitutional policy of indemnification is shown by evidence in the record that, throughout history, every LAPD officer who otherwise would have been required to pay a significant amount of his own money to a victim of his use of unconstitutionally excessive force has been indemnified by an act which required the approval of the City Council.[12]

---

12. Pursuant to Cal. Gov.Code § 825(a), police officers who are defended by the City are automatically indemnified for amounts awarded as compensatory damages. They are not so indemnified, however, for amounts awarded as punitive damages. Punitive damages are paid after deliberation by the City Council pursuant to § 825(b). Of the approximately fifteen instances of jury punitive damage awards reflected by the papers before the court that were not settled, it appears that in no more than two cases did the officer actually have to pay from his own funds. One of those cases, *Tave,* involved a punitive damage award of $1,000. Defendants indicate that there has been another instance where the council members have declined to pay a punitive damage award. Defendants' Motion at 4. However, they offer no evidence to support this claim,

The evidence shows that the acts of indemnification of LAPD officers by the City Council have been invariably made on the basis of recommendations from City Attorneys accompanied either by no descriptions or by inadequate and inaccurate descriptions of the acts being indemnified.

The evidence shows that the vast majority of indemnifications of officers from jury punitive damage awards were accomplished through settlements of cases in which all of the liabilities of the City and the officers were settled by agreements with the plaintiffs for a single lump sum. In each case, the City paid the entire sum, and the officers paid nothing.[13]

There is no evidence that before *Trevino v. Gates,* 99 F.3d 911 (9th Cir.1996) the council members considered their votes to be any more than budgetary matters, involved with requests to spend money in order to save money. It appears that the attorney defendants made the decisions as to which claims should be settled and which should be released, etcetera.

In *Trevino,* the Ninth Circuit appears to have accepted, without consideration, counsels' factual contention that the settlements were necessary to save the prospective costs of appeal, and to secure economically favorable settlements of the City's own liabilities. Counsel appears not to have told the Ninth Circuit that the same contentions had been made to the district court and rejected as non-factual. Because the issue is factual in nature, and because the Ninth Circuit's statement was made as dictum, the court is not bound by this portion of *Trevino.*

Neither in *Trevino* nor in this proceeding have the attorney defendants attempted an explanation of *why* it was necessary in order to settle the punitive damage awards for which it was *not* liable in order to settle the compensatory claims for which it *was.* The agreement between the City and the plaintiffs either could have simply settled all of the plaintiffs' claims except the claims for punitive damages or required the plaintiffs to seek in any new trial no more compensatory damages than had been paid in settlement. Either course would have settled all possible claims against the City, and made it unnecessary for the City to pursue any appeal further or participate in any subsequent trial, while leaving the plaintiffs free to pursue their punitive damage awards against the officers. Either course would have made it unnecessary for the City to participate further in any appeal or new trial.

There is no evidence that any council member has ever balked in any way before approving any of these settlements. The evidence shows that the approvals have been purely perfunctory acts taken on the unquestioned recommendation of the attorney defendants. There is no evidence that any council member ever asked whether it would be possible to settle the case without absolving the officers from liability for punitive damages, or that any council member ever asked anything about the merits of the underlying case.

In support of their allegation that the attorney defendants bear primary responsibility for the allegedly unconstitutional indemnification policy, plaintiffs point to evidence of the degree to which the attorney defendants allegedly went beyond their duties of fair representation of client representation to advance the officers' cause during the City Council's *Gomez* indemnification deliberations. One attorney defendant stated that "there's no evidence [the officers] acted with actual malice" towards the victims. Healy Dec., Exhibit A, at 18–19.[14]

Another attorney defendant, claiming to be making a "dispassionate" presentation of the "facts" of the case, might be said to have

---

or, in any event, to suggest that the officer paid more than a nominal amount.

**13.** It appears that the practice of indemnifying officers through settlement payments may have commenced long before § 825(b) was enacted in 1985. If so, the evidence may ultimately show that the primary use of § 825(b) has been to indemnify officers in cases which the City could

not settle and was forced to satisfy its own obligations by responding to judgment.

**14.** The attorney defendants also have pressed the fallacious argument that it would be cost effective for the City to pay the punitive damage award in the § 825(b) context. *See, e.g.,* Healy Dec., Exhibit A, at 7–10. This argument has no basis and borders on the specious.

made the same arguments previously tendered by the SIS officers and rejected by the jury. The attorney defendant admitted that the robbers had only toy guns, but argued that such a fact was "not supposed to matter and it doesn't matter in a court of law." *Id.* at 110. Ignoring the jury verdict, she also argued that "no one really can seriously contest that the officers saw what looked like revolvers." *Id.* at 111. In explaining that the officers had killed three people and wounded one person who had nothing but inoperable toy pellet guns, she stated:

> The jurors had some difficulty believing that these people would flash around pellet guns, but it happens. I mean, the papers are full of people who are so used to using pellet guns that they think almost they're real, and that's all they had, after all. That was the tragic part of it. I mean, nobody feels worse than the police officers involved. It was just devastating to find that out; but, nevertheless, there's nothing that these—that these officers did that the City should disapprove of.

*Id.*[15]

When asked to present the plaintiffs' theory, the attorney defendant characterized it as "a very extreme position, which it doesn't seem to me was accepted by the jurors." *Id.* at 113. She then summarized the entire plaintiffs' case as being based on the one surviving robbers' testimony that he had put the pellet guns in the trunk prior to the shooting, and that, therefore, the officers had planted the pellet guns on the bodies of the dead robbers. She stated that the plaintiffs' theory was that the SIS officers had deliberately allowed the robbery to occur for the purpose of trapping the robbers and shooting them. The attorney defendant stated, however, that she was "quite confident that the jury did not believe that theory." *Id.*

The attorney defendant told the council members that the verdict showed only "mar-

ginally excessive force" and that "the fact that the damages were so low—that is, the punitive damages were so low indicates a real compromise there, a real ambiguity." *Id.* This unsubstantiated view was later reiterated by another attorney defendant. *Id.* at 127.[16] Based upon the attorney defendants' admittedly skewed presentation, the council members voted to indemnify the officers.

Plaintiffs argue that the examples set forth demonstrate that the attorney defendants did nothing more than re-argue their case as if it were fact, notwithstanding that a jury had unanimously rejected defendants' position. They argue that the attorney defendants failed to present fairly the contrary evidence upon which the jury had based its verdict, and offered instead unfounded speculation about what the jury verdict meant. They also failed to inform the council members that their dual representation of the City and the officers in that proceeding presented a clear and actual conflict of interest.

The degree to which plaintiffs contentions may have merit cannot be appreciated without some discussion of the officers' testimony in *Gomez*. Although the court has been unwilling to develop or discuss any of the ways that plaintiffs might seek to impeach the testimony given by the officers with respect to the various robbery incidents, some such development is necessary at this point to put the remarks of the attorney defendants in perspective.

None of the three robbers killed in *Trevino* was killed in the initial shotgun barrage that accounted for almost all of the shots fired. On the contrary, according to the officers testimony, one of the robbers got out of the car and ran away. He was shot and killed when he allegedly turned and pointed his (toy) gun in the direction of the officers, leaving four officers, according to their testimony, with no choice but to shoot him.[17] The

---

**15.** The attorney defendant then admitted that she had "just lapsed into not a dispassionate presentation but a passionate presentation," but justified herself because she "[felt] very strongly about that." *Id.*

**16.** The robbers were not very attractive plaintiffs. They were suspected not just of the robbery after which the shooting occurred, but also of a string

of prior robberies. The survivor was serving 17 years in prison at the time of trial, and was forced to testify as to that fact.

**17.** Most of the bullets fired by the officers hit the robber in the back, leaving the jury reason to wonder whether they were fired while he had his back toward the officers as he ran away, or, as the officers testified, after he turned and pointed

other two robbers were killed several minutes after the initial barrage of shotgun shots, after the officers had approached the car. One robber was killed when, after having been critically wounded and being observed draped motionlessly over the steering wheel as the officers approached his car, he suddenly reared up and began to turn sharply in the direction of an officer who was standing next to the car. This allegedly left the officer no choice but to kill him by shooting him in the head with a handgun from a distance of a few feet. The other robber was killed, according to the officers, when, already seriously wounded, and with the body of another robber draped across his body, he reached toward a (toy) gun lying on the floor of the car. This allegedly left the officer no choice but to kill him by shooting him in the head with a handgun from a distance of less than three feet.[18]

There is also evidence to suggest that the attorney defendants went further than is legitimately to be expected of lawyers representing clients when representing LAPD officers in civil rights trials.

In *Gomez*, the attorney defendants based almost their entire final arguments on the alleged facts that long-tenured police officers like those assigned to the SIS would not risk their careers, their paychecks, their pensions or the potential liability to the victims by committing the kind of heinous acts of which they were accused, and that they would certainly not risk a term of imprisonment by committing perjury—particularly perjury to protect others from the consequences of acts which were not their own. *See Gomez v. Gates*, CV 90–856 JSL, Transcript of Closing Argument of Defendants, March 24, 1992, p. 28:13–21.

These are powerfully persuasive arguments.[19] The evidence before the court, however, provides little or no basis for the attorney defendants to hold a good faith be-

lief that any of the risks they describe to the jury have any reality in fact. The evidence suggests clearly that SIS officers bear no significant risk of being held accountable in any way for uses of excessive force, so long as other officers are willing to corroborate their versions of the relevant events. The evidence also suggests clearly that by virtue of the code of silence, such corroborating testimony will always be forthcoming, whether truthful or not.

The evidence provides little or no basis for a good faith belief that officers who give untruthful corroborating testimony risk any job consequence of any kind, or any liability to the victims which they would have to pay, much less any term of imprisonment if they give perjurious testimony on behalf of fellow officers. *See, e.g.,* Healy Dec., Exhibit A, at 203–205; Christopher Commission Report at 165–168.

The court holds that it is clear law that a policy of indemnification of police officers from jury punitive damage awards is unconstitutional if it is not maintained in good faith. The court further holds that it is clear law that it is unconstitutional to aid and abet others in maintaining such a policy. A reasonable juror considering the totality of the evidence, and resolving factual disputes in favor of the plaintiffs, could conclude that a person in the position of the attorney defendants would have known that his conduct was unconstitutional. Accordingly, the motion of the attorney defendants for qualified immunity is DENIED.

### COUNCIL MEMBER DEFENDANTS

Plaintiffs assert that the council member defendants have played a critical part in encouraging the unconstitutional course of conduct by the SIS officers, by adopting a policy which assures the officers that they will not have any financial responsibility to the victims of their acts. Plaintiffs allege

---

the (toy) gun in their direction. In addition, there is some discrepancy in the officers' testimony whether the robber pointed the (toy) gun at them before or after falling to the ground.

**18.** The jury did *not* award damages indiscriminately. Punitive damages were awarded only to

the officers who fired shots at the three dead robbers. The largest punitive damage awards were against the officers who shot already wounded robbers from close range.

**19.** The court notes that these arguments were not unique to *Gomez*. They are routinely made in final arguments of excessive force cases.

that the council member defendants rely on the code of silence to support their own policy of accepting officer versions of excessive force events as true over other more credible evidence to the contrary when making decisions with regard to officer indemnification.

The council member defendants argue that the Ninth Circuit decision in *Trevino v. Gates,* 99 F.3d 911 (9th Cir.1996), conclusively establishes their entitlement to qualified immunity. For this proposition they rely on the following language in the opinion:

> [A policy of indemnifying punitive damage awards] is not sufficiently similar to other actions that have been held unconstitutional to put reasonable Council members on notice that their actions could possibly violate constitutional rights.

*Id.* at 917.

This passage from *Trevino* affirms the district court's conclusion that before *Trevino* the law had not given council members adequate notice that a policy of indemnification would violate constitutional rights. Thus, both the district court and the Ninth Circuit agreed that the council member defendants in that case were entitled to qualified immunity.

Neither the district court nor the Ninth Circuit, however, suggested that the qualified immunity granted in that case would last forever, regardless of future circumstances. Quite the contrary. The above passage must be read in conjunction with the following:

> A city council does not violate section 1983 if it indemnifies officers against punitive damage awards on a discretionary, case by case basis, and complies in *good faith* with the requirements of Cal. Gov.Code § 825(b).

*Id.* at 918 (emphasis added).

This passage indicates that even *after* notice that a policy of indemnification could be unconstitutional, it would be so held, if the policy were pursued in good faith. The factual question of whether the policy *had* been pursued in good faith in the past was not before the Ninth Circuit, and they did not address it. The questions, therefore, are whether the undisputed evidence shows that the policy has continued to exist since *Trevino,* and whether it has been pursued in good faith.

Plaintiffs argue that the evidence shows that the policy has not been pursued in good faith in the past, and that there is no evidence of change. Indeed they contend that the evidence since *Trevino* proves that there has been no change and that the council members continue to fail to make a fair and independent examination of the facts at issue and rely instead on obviously incomplete and biased presentations. *See* Supplemental Declaration of Patricia Healy in Support of City Councilmembers' and City Attorneys' Motions for Summary Judgment, Exhibits 1–5.

Before *Trevino,* however, there is no reason to believe that any of the council members had considered these matters to be within their province. Their sole concern, as they may have seen it, was with the budget. For this reason, standing alone, the settlement approvals would support only a weak inference of bad faith.

Plaintiffs argue, however, that the evidence shows that the council member defendants not only have not acted in good faith in settlement agreements, they also have not acted in good faith when indemnifying officers pursuant to § 825(b). The evidence shows that prior to *Gomez,* the indemnification decisions under § 825(b) were handled in the same perfunctory manner as approvals of settlement agreements. The council voted to indemnify based on little, if anything, other than the recommendation of the City Attorney.

The *Gomez* deliberations, however, represented a sharp departure. The evidence shows that these were by far the most extensive deliberations in which the City Council has been involved. Both a 225 page set of interrogatory responses of one of the council members concerning the deliberations of the City Council and the actual transcript of those deliberations (the "*Gomez* transcript") are in the evidence before the court.[20] The court has reviewed this evidence in detail.

20. The court has been requested to take, and hereby does take, judicial notice of the Responses

The trial record showed that the SIS officers' testimony was seriously impeached at trial—either by other testimony or by the inherent incredibility of the specifics of the testimony. Otherwise, the jury verdict could not have been upheld by the district court as consistent with the weight of the evidence.[**] Nevertheless, the evidence reveals that no council member ever asked to see a transcript of the trial testimony, or even asked for a detailed summary of the testimony. The evidence does not reflect any discussion of the officer code of silence, or whether any officer testimony might have been tainted by their adherence to such a code.

Indeed, plaintiffs allege that the evidence shows that the deliberations over the § 825(b) vote in *Gomez* were directed almost entirely to finding an explanation for a jury verdict assumed to be improper, rather than to a good faith effort to determine whether the verdict was proper. *See* Healy Dec. at 16–194. Discussion was had about whether the jury was from within Los Angeles County, and whether future cases should be moved out of Los Angeles County to obtain favorable verdicts. *Id.* at 80, 82–83. Other questions were asked regarding the background of the trial judge, and whether he had been biased in his rulings. *Id.* at 84–85. Suggestions were made that the verdict was a reaction to the Rodney King incident or to the Christopher Commission Report. *Id.* at 126, 129, 150.

The presentation to the City Council was made by attorney defendants. The evidence suggests clearly that these attorney defendants continued in their roles as zealous advocates for their officer clients throughout the course of the indemnification proceedings. *See supra* pages 1270–71. There is evidence to support plaintiffs' contention that the council member defendants knowingly acquiesced in this biased presentation because it suited their purposes not to have their indemnification decision appear to be unjustified.

One or two council members did ask whether there was any evidence about which they had not been told, upon which the jury might have based its verdict. *See id.* at 70, 85.[21] Plaintiffs contend, however, that the evidence shows that the council members as a whole ultimately contented themselves with a summary of the evidence upon which no fair-minded person, much less a unanimous jury sworn to uphold justice, could have reached a verdict favorable to the plaintiffs.

*Trevino* does not say that the council member defendants can continue to indemnify the officers indefinitely, without inquiring into the underlying facts and without fairly considering all of the evidence. A jury could find that such "deliberations" were not in good faith. After the Christopher Commission Report and *Trevino*, a jury could find that the council members knew or should have known that there was a very high risk that they'd be indemnifying officers who were committing acts of excessive and deadly force. *Trevino* cannot be read to say that it is acceptable for the council member defendants to ignore such information and, in fact, it is clear law under *Larez* that they cannot ignore such information.

The court is aware that the evidence of bad faith on the part of the council members could be explained by their reliance on the inadequate disclosures and erroneous advice of counsel, as well as by drawing the inference desired by plaintiffs. As yet, however, no council member defendant has advanced any such contention.[22] The court expresses

---

of Zev Yaroslavsky to Plaintiff's Interrogatories, dated January 9, 1995, filed in *Trevino. v. Gates*, and the Declaration of Patricia Healy filed in *Singletary v. Gates*, Case No. CV 94–7995 JSL.

[**] As originally published, the opinion reflected the court's erroneous belief that the *Gomez* case was appealed and affirmed in an unpublished opinion.

21. Whether these council members' actions ultimately may absolve them from liability will be determined by a jury.

22. If such a contention were made, it would appear to pit the interests of the council member defendants and the attorney defendants squarely against each other. Both sets of defendants are represented by the same counsel. That counsel was engaged by the city council after *Gomez* to advise them with respect to future deliberations under § 825(b). The record indicates that, in the latter regard, counsel has made no independent review of the evidence concerning the acts to be indemnified, and has not questioned the advisability from the standpoint of the council mem-

no opinion about how its decision of this motion might have been affected had such a contention been made.

*Larez* established as clear law that public officials cannot knowingly engage in acts that cause others to inflict constitutional injury. *Trevino* gave notice that a policy of indemnification, if not carried out in good faith, could violate constitutional rights. On the basis of the evidence before the court, if a jury were to determine that the SIS officers used unconstitutionally excessive force, a reasonable jury could determine that the council members have maintained a policy of indemnification, that even since *Trevino*, they have not done so in good faith and that the policy was causally connected to the excessive force used. A reasonable jury could also find that, after *Trevino*, a reasonable council member could not have believed his conduct was lawful, in light of what he knew and the action he took. Accordingly, qualified immunity as to the council member defendants must be DENIED.

### THE MAYOR

■ The issues with respect to the Mayor of Los Angeles are similar to, but distinct from, those relating to the Police Chief and a number of the other public official defendants. As to other recently-appointed public official defendants, with the possible exception of the Police Chief, the court has concluded that it is a fact question whether the policies complained of by plaintiffs, if determined to exist, are attributable to those officials. As to the Mayor, however, it is possible to make this determination in his favor as a matter of law.

The plaintiffs' only alleged basis for holding the Mayor responsible for their alleged wrongs are that the Mayor appoints the Police Chief and the members of the Police Commission and considers the fiscal impact to the City of paying excessive force judgments and settlements. As the court has

repeatedly held, liability based upon the existence of policies that foster unconstitutional conduct fastens only upon those determined to be responsible for the policies' existence.

■ This applies not only to the Mayor, but to all defendants. Thus, even one responsible for the establishment of an unlawful policy cannot be held responsible for its continued existence after he or she has no further ability to change it, and others who have that ability have failed to act. *See Heller v. Bushey*, 759 F.2d 1371, 1375 (9th Cir.1985), *rev'd on other grounds sub nom. City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (*citing Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)) ("The proper individual defendants in this action are those officials who were in office before or at the time [unconstitutional conduct occurred] and who may have adopted a plan or policy authorizing or approving the alleged unconstitutional conduct."). Conversely, as the court has repeatedly held, those who inherit other people's policies along with the position which gives them the power to change the policies, must have a reasonable period to make those changes, before becoming themselves responsible for the consequences of those policies. *Id.*

■ Ordinarily, the determination of when the responsibility of the first person leaves off and the second commences is a question of fact which must be left to the jury. In this case, however, the Mayor's claim that it should be decided as a matter of law is appealing. The Mayor has no power to change policy affecting police matters directly. His power to effect changes is limited to his power to appoint people who will effect the changes he desires. The Mayor argues, as a matter of law, that the power to appoint people who can change undesirable practices is not equal to the power to change those practices directly, and that only people who have the direct power to change those

---

bers relying on the attorney defendants for this purpose.

The failure of the council members to assert reliance on the advice of counsel as evidence of the good faith of their own actions could lead a jury to conclude that the council member defen-

dants acted on their own, intending the consequences of their acts. This conclusion might lead in turn to the inference that the advice given by the attorney defendants was solicited and accepted, without being told of the true facts, for the purpose of producing plausible deniability.

policies can be held liable. The Mayor further argues that there is no clear law that would establish any such indirect liability. The court agrees on both counts. Accordingly, the motion of the Mayor for qualified immunity is GRANTED.

## CONCLUSION

Having reviewed the papers filed in connection with this matter, having heard oral argument, and being fully apprised of the relevant facts and law,

IT IS HEREBY ORDERED that the motion for summary judgment based on qualified immunity of the police policy-making defendants, council member defendants, and the attorney defendants be DENIED.

IT IS FURTHER ORDERED that the motion for summary judgment based on qualified immunity of Mayor Richard Riordan be GRANTED.

IT IS SO ORDERED.