**Jed Arno BLAIR, Plaintiff–Appellant,**

v.

**CITY OF POMONA, a municipal corp.; Charles Heilman, individually & in his official capacity, Defendants–Appellees.**

No. 98–55548.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1999

Filed March 21, 2000

Amended Aug. 2, 2000

Anne Richardson, Hadsell & Stormer, Pasadena, CA, for plaintiff-appellant.

Ann M. Maurer, David D. Lawrence, Franscell, Strickland, Roberts & Lawrence, Pasadena, CA, for defendants-appellees.

Before: PREGERSON, NOONAN and O'SCANNLAIN, Circuit Judges.

Opinion by Judge NOONAN;
Concurrence by Judge O'SCANNLAIN.

NOONAN, Circuit Judge:

Jed Blair appeals the summary judgment entered against him by the district court in his action against the City of Pomona (the City) for violation of 42 U.S.C. § 1983 after he had alerted the defendant to abuses in its police department, of which he was a member. We affirm the judgment against Blair on his claim of negligent supervision by the City. As to his other claims, however, we hold that there were material facts in dispute as to whether the defendant had a custom of harassing police whistleblowers. We further hold that Blair stated claims cognizable under California law for interference with his civil rights and the intentional infliction of emotional distress. We accordingly reverse the judgment of the district court and remand for proceedings consistent with this opinion.

## FACTS

Blair, a former United States Marine, was hired by the City's Police Department (the Department) in 1987. He was promoted to Senior Officer in 1992. He took on responsibility for the field training of other officers. In January 1994 he became the senior officer assigned to STOP, a detail dealing with nuisance-type problems in Pomona. He got along well with his peers and supervisors. His supervisors agreed that he was a good officer.

On April 9, 1995, Blair had a conversation while on duty with Michael Olivieri of the Department's Major Crimes Task Force (MCTF). Blair asked him, "How's the Task Force going?" Olivieri answered, "You don't even want to know." Blair said, "Like what?" Olivieri replied, "It's not just stealing money" and went on to fill Blair in on misdeeds he had witnessed that had been performed by fellow officers on the MCTF. The misdeeds included not only leaving early and drinking on duty but actual crimes including stealing money, throwing a couch upon a suspect while executing a search warrant, and, most shameful of all, taking heroin from one suspect and planting it on another—"stuff like that," as Olivieri blandly puts it in his deposition. Olivieri cautioned Blair that all of it was to be kept confidential: "Don't breathe this to anybody."

Blair told Olivieri that Olivieri could not withhold this information. The next day Blair reported the information to Lieutenant Watts and told Olivieri that he had done so. Olivieri himself then gave the information to Chief of Police Charles Heilman. On April 11, the chief thanked Blair for his help in bringing the information forward.

On April 12, the MCTF was temporarily disbanded. Officers Crenshaw, Dotson, Ezell, Lanier, and Patterson, all members of the MCTF, were suspended from duty. Blair did not keep his involvement in this result a secret.

The very same day, April 12, 1995, Olivieri got a message on his police pager: "187–187." The number designates the California Penal Code section for murder. Delivered on a police pager after the action against members of the MCTF, the number conveyed a meaning that Olivieri found ominous. He reported it as a threat. Blair and other members of STOP were assigned to Olivieri's home to protect him and his family.

One week after Blair and Olivieri had reported the misdeeds, Blair found "rat" scrawled in pencil on his police locker. Two days later he found "asshole" written on the locker. Within the week three officers turned their backs on Blair as he

walked down the center hallway of the first floor of the offices of the Department. He experienced this treatment again and then again. He next found a big green glob of spittle on his locker. The phenomenon was reported three or four times. About a week later he found his police locker wired shut with a coat hanger; Olivieri's locker had been similarly shut. Blair now reported the other locker incidents and the most recent one to Captain Romero and Sergeant Valdez.

About four weeks after Blair's reporting Olivieri's information on the members of the MCTF, Blair found his streamlight SL20 flashlight and a hand-held spotlight, which he kept on top of his police locker, to be missing; they had been removed from his police equipment bag. Blair reported the thefts to Sergeant Valdez.

Two days after his equipment had been stolen, Blair found that his STOP team shirt, which, normally hung on a rack, had been put in the trash can. Two days later he discovered another uniform shirt belonging to him placed in a urinal.

A little later in May 1995, Blair in a patrol car was communicating with Olivieri in a patrol car. Their communication was disrupted by a person "clicking mikes" on both of them, that is, pressing the button on radio microphones in a way to prevent the messages from going through. Blair reported the intentional interference to Sergeant LaFleur and Sergeant Valdez.

About two days later Blair left the police station and went to the police parking lot where his unit car was parked. He found trash from Taco Bell spread over the front floorboard of the car. The next day a soft drink was poured on the driver's seat of his car parked in the police parking lot; Blair had only been out of the car an hour, having entered the station house from a patrol and then returning on duty to the car. Within the next two weeks, soft drinks were twice more poured on his car's driver's seat, and trash was twice more distributed in his car. Each time he had locked his car. The keys to the police cars

of the same make were interchangeable and kept in the station.

In June 1995 Blair, while on patrol, saw four men apparently engaged in criminal activity. He called for backup. None came. After 23 minutes he decided that no assistance was coming and gave up the thought of making an arrest. He reported the incident the next day to Lieutenant Watts and Sergeant Valdez. Nothing was done to the two officers supposedly assigned to him as backup.

On July 4, 1995, Blair was the supervisor of an overtime detail at the Los Angeles County fireworks show. His wife and two small children attended the event and were then to pick him up at 11 p.m. When Officer Keltsen approached her car, he grabbed his groin and held it as he walked past Mrs. Blair and the children. Blair reported the incident to his supervisor and to Sergeant Valdez.

Later in July Blair was assigned to the MCTF. When he was advised of this transfer, Blair believed that "Sgt. Rogan was angry with [him] for encouraging Olivieri to go to the Chief with his concerns." Blair then confronted Rogan, asking him if Rogan wanted to work with him and offering to decline the new assignment if Rogan so wished. Rogan indicated that he still considered the disciplined officers to be his friends and that there was too much "gray area" with Blair. Rogan refused to make a commitment to work with Blair.

Rogan was "not thrilled" to be working with Blair because Blair had been an outspoken critic of the prior MCTF. Rogan told Blair that he felt no personal animosity toward him, but that he did not believe all Blair had said. Rogan also told Blair that he did not feel that Blair's actions toward the MCTF had been appropriate, specifically that Blair and Olivieri had reported the MCTF's misconduct to the Chief rather than to Rogan, the supervisor of the MCTF. When Rogan was told of Blair's selection as senior officer, he protested and requested that someone else be appointed. Captain Hargett rejected that

request, and told Rogan that the only way he could stay on the MCTF was if he was willing to work with Blair.

The week after the transfer, Blair told Romero that the assignment would not work out. Romero responded that "If you don't go, it's not good for the rest of your career." Blair alleged that he accepted the assignment out of fear for his career.

On September 10, 1995, at the Los Angeles County Fair, Pomona police officers pointed at his wife and Blair's mother, and one of them said, "Here comes the shithead's family" and pretended that he was about to vomit. Blair's mother recalled this incident and another at the fair where a Pomona officer said, "It's Jed's mother" and pointed his finger at her, while grabbing his stomach. His wife, crying, told Blair about the incidents later in the day, and he reported them to Lieutenant Watts and Sergeant Valdez.

Blair no longer kept any equipment in his locker. He rode to work on his motorcycle, and his mother brought his equipment in a van. Shortly after the incidents at the fair, his mother entered the police parking lot in the van, and one of the MCTF officers who had been suspended placed his police car in her path, preventing her from moving forward. Blair reported the incident to Sergeant Valdez.

On September 15, 1995, between 5 p.m. and 6 p.m., Blair's wife received a telephone call at home from a woman. The woman told her not to be surprised if Blair came home with broken legs, since he was "under the wing of the fat pig Romero" and that "they should get rid of the whole fucking family." The call came the same day former MCTF Officers Crenshaw, Dotson, and Ezell were officially terminated as members of the Department. Blair was immediately informed of the phone call, and in turn he immediately informed Lieutenant Todd and Sergeant Valdez. He received no police protection.

On October 11, 1995, Blair went into the police locker room and said hello to Officer Stries. Stries turned his back on him, saying nothing. Blair went to see his supervisor Rogan and began to cry. He said that everything had gotten to the point where he could not feel comfortable with the other officers and he just couldn't work; the threatening telephone call had been "the capper;" he needed to go home. Rogan agreed.

For the next twelve months, up to October 11, 1996, Blair received payment in lieu of disability. From the latter date up to November 16, 1997, he received accrued sick, vacation, and comp time. Thereafter he was on leave of absence without pay for several months. Blair was examined by three doctors who reported that he was "too sensitized" to police work in Pomona to be able to work in the Department. On December 17, 1997, the City sent him a notice of intent to terminate for absence from assigned duty without leave.

## PROCEEDINGS

On September 13, 1996, Blair began this action. In his second amended complaint he alleged that the Department had a custom or policy of retaliating against officers for exercise of their First Amendment right to free speech on matters of public concern; that the Department's acts or failures to act also resulted from a custom, practice or policy of inadequate training in deliberate indifference to the rights of such employees; and that as a result he had suffered loss of employment, depression and emotional distress. As a second cause of action he alleged constructive discharge; as a third cause of action, interference with the exercise of his civil rights; as a fourth, negligent supervision; as a fifth, intentional infliction of emotional distress; and as a sixth, assault. The named defendants were the City of Pomona, Chief Heilman in his official capacity, and Does 1 through 50. He asked for a jury trial.

On January 16, 1998, the City and Chief Heilman moved for summary judgment. On February 9, 1998, the district court conducted a hearing on the motion. Heilman was dismissed as a defendant without objection. Ruling from the bench, the

court dismissed the section 1983 claim "as a matter of law because plaintiff cannot demonstrate the existence of an adverse employment action and because plaintiff cannot demonstrate that the alleged constitutional violation was caused by a custom or policy of the City of Pomona as required by *Oviatt v. Pearce,* 954 F.2d 1470 (9th Cir.1992)." The court ruled that the constructive termination claim failed because Blair had not resigned. The court held that any interference with Blair's civil rights was outside the scope of employment of the perpetrators, so the City could not be held liable for it; similarly as to the emotional distress and assault claims. As to negligent supervision, the court held that the California Government Code did not create a cause of action for it and cited *Van Ort v. Stanewich,* 92 F.3d 831 (9th Cir.1996) for this conclusion. The court adopted with little change the City's Statement of Uncontroverted Facts and Conclusions of Law. On February 12, 1998, the court entered judgment for the defendants.

Blair appeals, restricting his appeal to his federal claim against the City and the state law claims of intentional infliction of emotional distress and negligent supervision.

## ANALYSIS

 Monell Liability. To establish § 1983 liability on the part of the City of Pomona under *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Blair must satisfy five conditions: (1) that he had a constitutional right; (2) that he was deprived of this right by an adverse employment action; (3) that the City had a custom created by those who may fairly be said to determine official policy; (4) that the custom amounted to at least deliberate indifference to Blair's constitutional rights; and (5) that the custom was the moving force behind the constitutional violation. *See Van Ort,* 92 F.3d at 835; *Oviatt,* 954 F.2d at 1474 (*citing City of Canton v. Harris,* 489 U.S. 378, 389–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

 Blair had the right under the First Amendment to inform his superiors of misconduct in the police department. *See Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach,* 881 F.2d 816, 818–19 (9th Cir.1989). This right is uncontested, so Blair has satisfied the first condition. The second, third, fourth and fifth conditions are ordinarily to be determined by a jury if there are disputed facts in their regard. *See Oviatt v. Pearce,* 954 F.2d 1470, 1477 (9th Cir.1992); *cf. Davis v. Mason County,* 927 F.2d 1473, 1482 (9th Cir.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). Hence on this appeal from summary judgment, our inquiry is whether Blair presented sufficient evidence, if all inferences were drawn in his favor, for a jury to conclude that the policy-makers of the City approved a custom or policy amounting to at least deliberate indifference to his right to inform his supervisors of misconduct and that this custom or policy caused the violation of his right.

We have set out the evidence answering this inquiry. In a period of five months, from April 12, 1995, when he informed the Department, to October 15, 1995, when he couldn't take the heat any more, Blair was subjected to a series of acts that a reasonable factfinder could infer were inflicted by members of the Department with the knowledge and tacit connivance of those running the Department. Those acts included insults written on his locker; spittle spat on his locker; the wiring shut of his locker; the theft of his equipment; the cutting off of his radio communication; the trashing of his uniforms; the dumping of drinks in his unit car; the backturning of fellow officers; the tolerated denial of backup; the insults offered by officers to his mother, wife, and children; the blocking of his mother's car; his removal as head of STOP and transfer to a position subordinate to an officer who didn't want him; the telephoning of a threat of bodily injury to him and of death to his family; and the failure to provide a guard for him after the threat.

This evidence, if believed by the jury, would be sufficient to establish that the Department had the custom of chastising whistleblowers and constitute adverse employment action. It would also be sufficient to establish that the Department had failed to train its members not to retaliate against whistleblowers and/or that the Department had failed to discipline those members of the Department who retaliated against whistleblowers. It would be open to the jury to conclude that one or more of these customs or policies was made by those in charge of the Department who were aware of the police code of silence; that the custom or policy amounted to at least deliberate indifference to Blair's right to speak; and that the policy was the moving force resulting in the constitutional deprivation suffered by Blair. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235, *as amended*, (9th Cir.1989).

The City asserts explanations and defenses, but they depend on disputed facts and inferences, proper for a jury to consider but not effective to sustain summary judgment. The City places emphasis on the fact that Blair could not identify all of the individual perpetrators of these acts. A reasonable factfinder could infer that they were the acts of Pomona police officers, who had access to the police lockers, the police equipment, the uniforms, and the police cars and who, in the case of the death threat, had access to knowledge of the termination of the MCTF officers and had therefore the motive necessary to instigate the vicious call.

Another line of defense for the City is that the Department did respond to the wiring of Blair's and Olivieri's lockers by an order against such conduct and that an officer said he would investigate the cutoff of radio communications. At trial these contentions may be used to show that the policy-makers disapproved of the custom of harassing the whistleblower. They do not by themselves disprove Blair's evidence of custom.

■ Another line of defense for the City is that the acts were not performed by members of the police under color of law. That cannot be said of the cruiser blocking his mother, the cutting of the radio communications, the failure to provide backup, the failure to provide a guard after a death threat or the removal from head of his unit to a subordinate position under an unfriendly head. It is a question of fact as to whether the defense holds as to the insults to him, the spit, the uniform trashing, the equipment theft, the drinks poured on his car, the insults and threat to his family. One interpretation of these events is that they were private acts of revenge by stupid, sullen police officers outraged at having corrupt police conduct spoken of and punished. If so, they were not performed under color of law and, although not as gross as the robbery, assault, and torture committed by a San Diego Sheriff's Department detective, must be classed as private acts not covered by § 1983. *See Van Ort*, 92 F.3d at 835. On the other hand, Blair's evidence goes to show that these acts were departmental custom, to punish the officer informing against fellow officers.

■ It is open to the City to show that the custom was not known to the policy-makers of the Department, but the absence of formal reports of Blair's harassment is only an element of evidence as to their knowledge or lack of knowledge; it is not dispositive.

As to the consequences of the custom, if it is proved, Blair has offered evidence that it reduced him to a psychological state where he could not perform his work; damages would be assessed accordingly if this condition were not rebutted.

■ In accordance with the usual rules governing summary judgment, we have stated the facts as presented by the non-moving party and the inferences that could reasonably be drawn from them. The evidence presented to the district court, if believed at trial, and the inferences if

drawn by the jury, would justify the conclusion that the Department had a custom, approved by its policy-makers, of at the very least deliberate indifference to the right of a member of the Department to report to a superior the misconduct of a fellow officer. The seriousness of such a custom and the need of a civil rights remedy for it is underlined by what has been observed around the country as to the code of silence in police departments. *E.g., Thomas v. City of New Orleans,* 687 F.2d 80 (5th Cir.1982); *White–Ruiz v. City of New York,* 983 F.Supp. 365, 379 (S.D.N.Y.1997); Douglas L. Colbert, *Bifurcation of Civil Rights Defendants: Undermining Monell in Police Brutality Cases,* 44 Hastings L.J. 499, 550, n. 271 (1993). The thorough examination of police practices in Los Angeles after the beating of Rodney King by uniformed police officers described the officers' "code of silence" as consisting in a single rule: "an officer does not provide adverse information against a fellow officer." *Report of the Independent Commission on the Los Angeles Police Department* 168 (1991) (the Christopher Commission Report). According to the Christopher Commission, all police officers adhere to this rule, even good ones. It is a formidable barrier to the investigation of complaints about the police. *See id.* The Commission cited instances where officers were officially punished for breaking the code. *See id. at* 170. We take judicial notice of the report. *See, e.g., Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 981 n. 18 (9th Cir.1999); *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994); Fed.R.Evid. 201(c). The code of silence has been found to continue in Los Angeles despite the findings and recommendation of the Christopher Commission. *See Cunningham v. Gates,* 989 F.Supp. 1262, 1267 (C.D.Cal. 1997).

From teenage gangs to adult associations, loyalty has a high place and often operates to discourage any breach of confidentiality thought to be a threat to the interests of the group. The group acts to maintain itself. Understandable as this kind of loyalty is, it is not tolerable when preservation of the organization undercuts the central purpose of the organization. The police are specially armed and empowered to act in order to combat crime. Their mission is subverted if they commit crimes and a code of silence protects the crimes. American police do not have the privileges of praetorians. Silence to protect criminal policemen cannot be supported by a civilized community. Ingrained although such a custom may be, it cannot be a defense, and indeed it may be a cause of liability, for a city supporting it, when the custom leads to the disciplining of an officer brave and straight enough to challenge it as cowardly and perverse.

■ The State Claims. A public entity is liable for injury "proximately caused by an act or omission of the employee of the public entity within the scope of his employment." Cal. Gov't Code § 815.2a. Several of the acts of which Blair provided evidence—the transfer, the blocking of his mother's car, the interference with his radio communication, and the failure of backup and its official toleration—were arguably within the scope of employment of Pomona police officers. The other acts of harassment also were within the scope of their employment if it is found as a fact that there was a police code of silence in the Department, enforced by police officers. Such acts would be very different from "[t]he free-lance criminal exploits" recognized as not giving issue to liability under the California statute. *Van Ort,* 92 F.3d at 840. Consequently, if the jury finds the custom to exist, it may consider the claims advanced under California law for the intentional infliction of emotional distress. We agree with the district court that Blair's claim for negligent supervision must be dismissed. *See Van Ort,* 92 F.3d at 840–41.

*Conclusion.* Judgment against Blair on his Fourth cause of action is AFFIRMED. Summary judgment on Blair's First and Fifth causes of action is REVERSED, and

the case is REMANDED for proceedings consistent with this opinion.

O'SCANNLAIN, Circuit Judge, specially concurring:

While I concur in the opinion of the court, I write separately to note that this was a close case that turned largely on the threshold of summary judgment, which requires just a single issue of material fact for reversal. Whether the facts averred by Blair constitute a policy of harassment by the City of Pomona against whistle-blowers is far from clear. Indeed, many a reasonable factfinder could conclude that they do not.

The four acts identified by the majority as clearly having been performed under color of state law are not overwhelming evidence of a deprivation of Blair's civil rights. The first incident, involving the placement of a police car in the path of Blair's mother, could easily be viewed as trivial. Evidently, she could move in any other direction but forward and was waylaid for no more than a matter of seconds. Second, the interruption of one of Blair's radio transmissions might have been largely undistinguishable from ordinary radio static and occurred only once. Third, Blair complained of not receiving backup on a single occasion; it is impossible to say, however, whether the 23 minutes he waited is longer or shorter than the average wait for backup. Fourth, Blair was indeed transferred, but so too was his entire team.

These incidents could easily be viewed as innocuous, and I concur in the majority's opinion only to the extent that it holds that one or more issues of material fact exist.