**M. HERNANDEZ, Plaintiff,**

v.

**Daryl F. GATES, et al. Defendants.**

**No. CIV. 99–11696.**

United States District Court,
C.D. California.

June 20, 2000.

Yagman & Yagman & Reichmann (Stephen Yagman, Marion R. Yagman, Joseph Reichmann), Venice Beach, CA, O'Neill, Lysaght & Sun LLP (Brian C. Lysaght, Frederick D. Friedman, Katherine A. Kates), Santa Monica, CA, for plaintiff.

James K. Hahn, City Attorney, Cecil W. Marr, Senior Assistant City Attorney, Kirn Rodgers Westhoff, Deputy City Attorney, Los Angeles, CA, Manning & Marder Kass Ellrod Ramirez (Steven D. Blades), Los Angeles, CA, Franscell Strickland Roberts & Lawrence (David D. Lawrence, Michael Allen), Pasadena, CA for defendant.

## FURTHER MEMORANDUM AND ORDER RE CITY COUNCIL MEMBERS' MOTION TO DISMISS UNDER RULE 12(b)(6), *FED. R. CIV. P.*

FEESS, District Judge.

## I.

### INTRODUCTION

In this case, the Court was presented with motions to dismiss the original complaint against all defendants, including members of the Los Angeles City Council, under Rule 12(b)(6) of the *Federal Rules of Civil Procedure.* In a separate order, the Court issued a ruling granting the motion with leave to amend as to most of the defendants in the case. However, with respect to the civil rights claims brought against members of the Los Angeles City Council, the Court granted the motion to dismiss without leave to amend because the Court concluded that those defendants have qualified immunity from suit. This memorandum sets forth in greater detail the reasons for the Court's ruling on the qualified immunity issue. To place these issues in context, the Court first re-visits the facts giving rise to the present action.

## II.

### FACTUAL BACKGROUND

This lawsuit arises out of plaintiff Hernandez's (referenced as "plaintiff" or "Hernandez") encounter with two police officers—convicted felon Rafael Perez and his partner Nino Durden—now infamous for their connection to what has become known as the Los Angeles Police Depart-

ment ("LAPD") Rampart scandal. For purposes of assessing the merits of the council members' motion to dismiss, the Court adheres to the long-standing principle that everything Hernandez avers regarding his encounter with Perez and Durden is true. *NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *see also Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980) (complaint must be read in light most favorable to plaintiff).

## A. What the Police Officers Are Alleged to Have Done

In October 1996, Hernandez, who admits to being a convicted felon, was illegally stopped by LAPD Officers Perez and Durden. (Complaint, ¶ 10.) During this contact, Perez and Durden planted a gun on or near him so that plaintiff would appear to be a convicted felon in illegal possession of a firearm. (*Id.*) Plaintiff was arrested, convicted and served time in state prison on the fabricated charge. (*Id.*) He was paroled in October 1998. (*Id.*) In 1999, after Perez began cooperating with the District Attorney's Office in an investigation into police corruption, the District Attorney successfully moved to have plaintiff's conviction vacated. (Complaint, ¶ 3.)

## B. City Council's Role in the Affair

One might ask: what does this have to do with members of City Council? Were they in the car with the officers on the night in question? Were they acting as the Watch Commander at the relevant time? Did they have some role in an internal affairs investigation that exonerated Perez and Durden, or did the Council take some action approving the offending officers' conduct? Were Perez and Durden acting pursuant to some policy estab-

lished by the City Council? The answer to all of these questions is "No." Rather, plaintiff alleges that the Council members' liability arises from past decisions they made regarding the indemnification of police officers against whom civil rights damages had been awarded.

Plaintiff explains it this way: In defending LAPD officers, the City Attorney's Office has a scheme of "always seeing to it that punitive damages awarded by juries against LAPD officers for civil rights violations would be paid by the City, and not by the LAPD officers[.]" (Complaint, ¶ 13.) The City Attorney could do this because he represented both the officers and the City. (*Id.*) However, rather than give advice to the City Council, the City Attorney presented only factual summaries, so that the Council would "rubber stamp" the decisions to indemnify officers for punitive damages awards. (*Id.*)

According to plaintiff, the City Council, using this information, established a custom, policy or practice of indemnifying police officers in civil rights cases where punitive damages were awarded against the officer-defendants. (Complaint, ¶ 13.) Implicit in the complaint is the allegation that such conduct caused future civil rights violations in general, and specifically constituted a proximate cause of the violation of plaintiff's civil rights at the hands of Officers Perez and Durden. Thus, plaintiff asserts that he has stated a cause of action against City Council members under 42 U.S.C. § 1983.[1]

The City Council members, who have statutory authority to indemnify punitive damage awards against public employees pursuant to *California Government Code* § 825(b),[2] move for dismissal under the

---

1. Plaintiff sues the present Council members in both their individual and official capacities; he sues the former Council members in their individual capacities only.

2. *California Government Code* § 825(b) states that
   . . . a public entity . . . is authorized to pay that part of a judgment that is for punitive

or exemplary damages if the governing body of the public entity, acting in its sole discretion, finds all of the following:
   (1) The judgment is based on an act or omission of an employee or former employee acting within the course and scope of his or her employment as an employee of the public entity.

qualified immunity doctrine. The Court begins the discussion of the issue before it with a review of the doctrine of absolute immunity and the Ninth Circuit decision that explains why the Council members may assert only the defense of qualified immunity under the circumstances of this case. Thereafter, the Court addresses the qualified immunity issues.

## III.

### ABSOLUTE IMMUNITY

■ Government officials are often entitled to some form of immunity from suit. *See e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 806–07, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982); *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982). Legislators performing their legislative functions are absolutely immune from suit. *See Bogan v. Scott–Harris,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998); *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). While absolute immunity extends to the legislative acts of local legislators, "not all governmental acts by a local legislator, or even a local legislature, are necessarily legislative in nature." *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 580 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985). Thus, when a local legislator acts in an administrative capacity, he or she is entitled to, at most, qualified immunity. *Trevino v. Gates,* 23 F.3d 1480, 1482–83 (9th Cir.), *cert. denied Wachs v. Trevino By and Through Cruz,* 513 U.S. 932, 115 S.Ct. 327, 130 L.Ed.2d 286 (1994) ("*Trevino I* ").

■ In *Trevino I,* plaintiff asserted a claim similar to that presented here—that members of the Los Angeles City Council were responsible for the violation of his civil rights by virtue of having voted in the past to indemnify police officers against punitive damage awards. The City Council members moved to dismiss the complaint, claiming that, as legislators performing a legislative function, they were entitled to absolute immunity from suit. *Trevino I,* 23 F.3d at 1481–82. The Ninth Circuit disagreed.

In reviewing the provisions of *California Government Code* Section 825(b), the Ninth Circuit noted that the decision to indemnify is made on a case-by-case basis, does not involve the formulation of policy, and does not apply to the community at large. *Trevino I,* 23 F.3d at 1482. Applying the principle that " 'an act which applies generally to the community is a legislative one, while an act directed at one or a few individuals is an executive one,' " the Court found that the decision to indemnify is "directed toward shielding individuals from specific damages awards" and thus was not a legislative action. *Trevino I,* 23 F.3d at 1482 (quoting *Bateson v. Geisse,* 857 F.2d 1300, 1304 (9th Cir.1988)). Accordingly, the Ninth Circuit held that Council members were not entitled to absolute immunity from suit, but specifically reserved the question of whether the Council members were entitled to qualified immunity. *See Trevino I,* 23 F.3d at 1483 n. 3. That issue ultimately arose in a second appeal in the *Trevino* litigation, and is most readily understood in the context of the Supreme Court jurisprudence that has developed since the 1982 decision in *Harlow.*

## IV.

### QUALIFIED IMMUNITY

A. *Supreme Court Precedent*

■ Where an official is sued in an individual capacity, he or she may assert quali-

---

(2) At the time of the act giving rise to the liability, the employee or former employee acted, or failed to act, in good faith, without actual malice and in the apparent best interests of the public entity.

(3) Payment of the claim or judgment would be in the best interests of the public entity.

fied immunity as an affirmative defense.[3] The doctrine of qualified immunity, in its present form, was first articulated in *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. There the Court wrote:

> We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly established statutory or constitutional rights of which a reasonable person would have known.*

*Id.* (emphasis added). The Court observed that "[t]he public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the *objective legal reasonableness* of an official's acts." *Id.* at 819, 102 S.Ct. at 2739 (emphasis added); *see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (official's personal liability "turns on the 'objective legal reasonableness' [citation] of the action assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken"). In the view of the Supreme Court, this test protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ Qualified immunity is not only immunity from liability but also immunity from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). The fundamental purpose served by permitting officials to assert this defense is to prevent "excessive disruption of government" by enabling a resolution of liability claims against officials at the earliest possible time. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2739. By setting out the objective standard in *Harlow*, "the Court very explicitly put the common law aside

in favor of the public policy of protecting officials who are sued personally for damages from the burdens of discovery and trial." 1B Schwartz & Kirklin, *Section 1983 Litigation: Claims and Defenses*, § 9.15, at 346 (3d Ed.1997) (hereinafter "Schwartz") (citing *Wyatt v. Cole*, 504 U.S. 158, 165, 112 S.Ct. 1827, 1832, 118 L.Ed.2d 504 (1992)).

■ Under this standard, the question before this Court is whether the approval of police officer requests for indemnification pursuant to *California Government Code* Section 825(b) violates clearly established statutory or constitutional rights of which the Council members should have been aware. The City Council defendants claim that there is no clearly established law indicating that their actions were unlawful, and that they therefore have qualified immunity from suit in this case. For support they rely principally on the Ninth Circuit decision in *Trevino v. Gates*, 99 F.3d 911 (9th Cir.1996), *cert. denied*, 520 U.S. 1117, 117 S.Ct. 1249, 137 L.Ed.2d 330 (1997) ("*Trevino II*"). Plaintiff disagrees and counters with the decision of the district court in *Cunningham v. Gates*, 989 F.Supp. 1262 (C.D.Cal.1997).

### B. *The Competing Authorities*

#### 1. *Trevino II*

In *Trevino II*, the Ninth Circuit undertook consideration of the issue it reserved in *Trevino I;* that is, whether the City Council members were entitled to qualified immunity from suit in connection with their decisions whether to indemnify punitive damages awards against police officers. The Court concluded that the Council members were entitled to qualified immunity and thus affirmed the summary judgment in the Council's favor.

---

**3.** Suits against officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent[.]" *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). "As long as the government entity receives notice

and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).

The *Trevino II* Court began by reviewing the legal standard for qualified immunity in the Ninth Circuit:

Qualified immunity is an immunity from suit. Public officials sued under 42 U.S.C. § 1983 are entitled to qualified immunity if:

(1) the right they allegedly violated was not clearly established at the time of the violation, or

(2) if a reasonable [official] would have thought that the defendants' actions were constitutional.

The plaintiff has the burden of proving that the right allegedly violated was clearly established. If the plaintiff meets this burden, then the defendant must prove that his conduct was reasonable even though it might have violated the law. The threshold determination of whether the law governing the conduct at issue is clearly established is a question of law for the court.

99 F.3d at 916–17 (citations and internal quotations omitted).[4] In *Trevino II*, therefore, the question presented was whether City Council's past decisions to indemnify police officers against punitive damage awards violated the plaintiff's right to be free from unlawful seizure or from police use of excessive force.

For purposes of its analysis of the qualified immunity issue, the *Trevino II* Court assumed that there was a custom or policy of indemnifying officers for punitive damage awards, and undertook a review of the applicable law to determine whether a reasonable Council member would have understood "that payment of punitive damages violates any constitutional right either

now or prior to the fatal shooting." 99 F.3d at 917. Resolving that question in favor of defendants, the Court reached several important conclusions. First, the Court noted that the Council's indemnification of a punitive damage award was authorized under *California Government Code* Section 825(b), a lawfully enacted state statute which has never been held to violate federal statutory law or the United States Constitution. *Id.* The Court further observed that under California case law, indemnification is discretionary (*Cornwell v. City of Riverside*, 896 F.2d 398, 399 (9th Cir.), *cert. denied* 497 U.S. 1026, 110 S.Ct. 3274, 111 L.Ed.2d 784 (1990)) and that whether a municipality " 'reaches a different result as to the good faith of the officers than a federal jury is not decisive: the City is not bound by the jury's findings when it makes its decision to indemnify.' " *Id.* (citing *Cornwell*, 896 F.2d at 399). Finally, the Court noted that similar cases from other jurisdictions have held that indemnifying punitive damage awards against police officers could not cause a constitutional deprivation. *Id.* (referring to, for example, *Ekergren v. City of Chicago*, 538 F.Supp. 770, 772–73 (N.D.Ill. 1982)).

Having reached those conclusions, the Court held:

Thus, far from being "clearly established law," a policy of indemnifying punitive damage awards has never been judicially determined as violating constitutional rights by encouraging police officers to use excessive force. In fact, *Cornwell* indicates that indemnification is discre-

---

4. The Court is not certain that this formulation of the standard is entirely consistent with Supreme Court precedent, since it suggests that a governmental official could act reasonably while violating clearly established law. Professor Schwartz comments that, although a number of circuits have formulated multi-part tests in articulating the substance of the qualified immunity defense, "clearly established federal law and objective reasonableness are not different tests, but alternative ways of articulating the pertinent inquiry."

1B Schwartz, § 9.17, at 362. He concludes, "any way one slices it, the controlling inquiry is whether the official violated clearly established federal law." *Id.* To the extent that the *Trevino II* standard is inconsistent with controlling Supreme Court law, the Court is obligated to follow Supreme Court precedent. However, since the Court is presented with the threshold determination of "clearly established law," the second prong has no impact in this case.

tionary and *Ekergren* casts serious doubt on whether an indemnification policy may legally cause the use of excessive force. Such a policy is not sufficiently similar to other actions that have been held unconstitutional to put reasonable Councilmembers on notice that their actions could possibly violate constitutional rights. [Citation.]

*Trevino II*, 99 F.3d at 917. Thus, the Ninth Circuit held that the Council members possessed qualified immunity from suit. Still unanswered, however, was the City's liability on the same theory.[5]

The *Trevino II* Court addressed the *merits* of the indemnification theory as it related to the liability of the City,[6] noting that the City could be held liable if a violation was caused by official governmental policy or long-standing custom or practice that amounts to a policy. *Id.* at 918. The Court upheld the district court's entry of summary judgment in favor of the City, concluding that the undisputed facts established that the indemnification of punitive damage awards was not part of a long-standing custom or practice that amounted to a well-established policy. In that regard, the Court reviewed detailed evidence that established that, prior to the events at issue in *Trevino II* (February 12, 1990), the Council had never voted to indemnify an individual officer, and that only nine cases involving punitive damage awards were settled prior to appeal. In four of those nine, the plaintiffs waived recovery of punitive damages. *Id.* at 918–19. The Court concluded:

> Viewing plaintiff's evidence in the light most favorable to her, the undisputed evidence falls far short of establishing a "persistent and widespread" practice

such that it constitutes "permanent and well settled" city policy. The record is virtually devoid of any direct evidence of council indemnification prior to the shooting. The record as to the indirect claims reveals a varied and inconsistent *ad hoc* practice of resolving excessive force cases prior to the incident in question. If there is a pattern, it is more reflective of normal municipal claims adjusting with all its inconsistences and imperfections than of a subtle conspiracy to indemnify officers outside the public eye.

*Id.* at 919–20.

Taken in its entirety, the *Trevino II* decision makes it quite clear that indemnifying of police officers for judgments rendered against them does not violate any clearly established federal law. Accordingly, *Trevino II* concluded that Council members are entitled to qualified immunity for decisions made regarding such indemnification. As the Court reasoned, there is nothing in the law that would have put the Council members on notice that their decisions regarding indemnification could possibly violate a citizen's constitutional rights. Likewise, it appears to this Court that nothing in *Trevino II* changes that proposition. Nevertheless, at least one district court has read *Trevino II* to eliminate the defense of qualified immunity under present circumstances.

### 2. *Cunningham v. Gates*

In *Cunningham v. Gates*, 989 F.Supp. 1262 (C.D.Cal.1997), plaintiff pursued a claim against the Los Angeles City Council asserting that City Council members were responsible for violations of his civil rights

---

5. Although this analysis is not controlling with respect to the qualified immunity of the Council members, it adds important context to the *Trevino II* Court's decision.

6. The Court noted, "[e]ven though the Councilmembers are entitled to qualified immunity, the City may still be subject to municipal liability for causing a constitutional violation under 42 U.S.C. § 1983." 99 F.3d at 918.

This Court is somewhat skeptical that such a theory is tenable under any circumstances because of the lack of a "close causal connection" between the conduct of the Council and the civil rights violations. *See* Section V.B., *infra.* Where the Council's decisions do not cause a Section 1983 violation, *Monell* holds that there is no basis for the imposition of Section 1983 liability.

allegedly committed by LAPD officers.[7] The court described the claim as follows:

Plaintiffs assert that the council member defendants have played a critical part in encouraging the unconstitutional course of conduct by the SIS [Special Investigative Services] officers, by adopting a policy which assures the officers that they will not have any financial responsibility to the victims of their acts. Plaintiffs alleged that the council member defendants rely on the code of silence to support their own policy of accepting officer versions of excessive force events as true over other more credible evidence to the contrary when making decisions with regard to officer indemnification.

*Id.* at 1272–73.

The City Council defendants claimed that they had qualified immunity from suit, but the district court disagreed. The court suggested that *Trevino II* changed the contours of the qualified immunity doctrine by putting Council members on notice that a policy of indemnification could be unconstitutional. *Id.* at 1273. In support, the court quoted the following sentence from *Trevino II:* " 'A city council does not violate section 1983 if it indemnifies officers against punitive damage awards on a discretionary, case by case basis, and complies in *good faith* with the requirements of Cal. Gov.Code § 825(b).' " ¤*d.* (quoting *Trevino II*, 99 F.3d at 918) (emphasis in *Cunningham*). On the strength of this single sentence, the *Cunningham* Court concluded that the City Council defendants could no longer assert a defense of qualified immunity. Rather, the Court concluded that members of the City Counsel would be required to defend ,either on the ground that there is no policy of indemnifying punitive damage awards or that such a policy has been pursued in good faith. *Cunningham*, 989 F.Supp., at 1273.

Based on that assessment of *Trevino II*, the court undertook a wide-ranging discussion of a number of issues it apparently believed pertinent to Council members' good faith, including whether its "policy" had changed in any way; whether, in individual cases, it had made a fair and independent assessment of the facts at issue before making a decision to indemnify; whether the Council relied on any information other than the recommendation of the City Attorney; whether in a related case testifying police officers had been impeached and whether the City Council members had requested a transcript of their testimony; whether the City Council members had discussed the code of silence; and other similar issues. The tone of the discussion suggests that such inquiries were relevant and proper for consideration by a federal jury in a civil rights action against members of the City Council. Thus, the *Cunningham* court observed:

*Trevino* does not say that the council member defendants can continue to indemnify the officers indefinitely, without inquiring into the underlying facts and without fairly considering all of the evidence. A jury could find that such "deliberations" were not in good faith. After the Christopher Commission Report and *Trevino,* a jury could find that the council members knew or should have known that there was a very high risk that they'd be indemnifying officers who were committing acts of excessive and deadly force. *Trevino* cannot be read to say that it is acceptable for the council member defendants to ignore such information and, in fact, it is clear law under *Larez* [8] that they cannot ignore such information.

*Id.* at 1274.

Thus, the court concluded that, on the evidence before it, "if a jury were to deter-

---

7. That the theories are substantially identical is explained by the fact that both cases were brought by the same attorneys.

8. *Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir.1991). *See* Part V.A.1, *infra.*

mine that the SIS officers used unconstitutionally excessive force, a reasonable jury could determine that the Council members have maintained a policy of indemnification, that even since *Trevino*, they have not done so in good faith *and that the policy was causally connected to the excessive force used.*"[9] *Id.* at 1275 (emphasis added). For those reasons, the court denied the City Council's claim of qualified immunity from suit.

### C. *Cunningham Is Neither Controlling Nor Persuasive*

This Court is not persuaded that the single sentence relied on in *Cunningham* alters the otherwise unambiguous conclusion of the Ninth Circuit that City Council members are entitled to qualified immunity from Section 1983 suits under the circumstances presented in this case. Unlike the *Cunningham* Court, this Court does not read *Trevino II* as establishing a clear and unambiguous rule that indemnification decisions are, or even might be, deemed to cause civil rights violations which could give rise to Section 1983 liability. Thus, this Court concludes that *Trevino II* mandates a finding that the City Council defendants are entitled to qualified immunity from suit; the case against them should therefore be dismissed.[10]

### V.

### CUNNINGHAM IS INCONSISTENT WITH WELL-ESTABLISHED SECTION 1983 JURISPRUDENCE

A careful analysis of *Cunningham*'s reasoning demonstrates additional reasons why, beyond the straightforward applica-

tion of *Trevino II* to the facts of this case, the "indemnification theory" of City Council liability finds no support in the law.

### A. *The City Council's Indemnification Responsibility Is Not "Supervisorial"*

■ Because the Council is not the municipality, a Council member's liability must be analyzed separately from the municipality's liability. *Trevino II*, 99 F.3d at 918; *see City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Likewise, because none of the Council members is alleged to have participated personally in the tortious conduct which was allegedly caused by their indemnification decisions, they cannot be held individually responsible as direct tortfeasors. *See* 1B Schwartz § 7.19, at 117. Further, the Council members cannot be held responsible on a straight respondeat superior theory because such liability is precluded under Section 1983 jurisprudence. *Monell*, 436 U.S. at 693–94 & n. 58, 98 S.Ct. at 2037 & n. 58; *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1390 (7th Cir.1984). Thus, it would appear that *Cunningham* reached its conclusion by treating the City Council members as "supervisors" within the meaning of Section 1983 jurisprudence. This is confirmed by *Cunningham*'s citation to *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991), in support of its rejection of the Council members' defense of qualified immunity.

### 1. *Larez v. City of Los Angeles*

In *Larez*, plaintiff brought suit under Section 1983 alleging that LAPD officers had conducted an illegal search and used

---

9. As discussed below, this element is crucial to any plaintiff's claim, but the assumption that a jury could find the existence of causation was not subjected to analysis, let alone critical scrutiny, in *Cunningham*'s discussion of qualified immunity.

10. An earlier Ninth Circuit decision—*Sanders v. Kennedy*, 794 F.2d 478 (9th Cir.1986) (per curiam)—is distinguishable. In that case, the plaintiff alleged that members of the Anaheim City Council selected, trained, employed and

retained police officers predisposed to violate constitutional rights in deliberate indifference to the rights of citizens, giving rise to supervisorial liability. Thus, it is not a case involving the indemnification issue before this Court. In this case, the plaintiff has not, and indeed cannot, claim that the City Council participates in any way in the actual hiring, firing and disciplining of police officers. *See* Section V.A., *infra*.

excessive force in conducting the search.[11] With respect to the claim that Police Chief Gates was liable for the constitutional torts allegedly committed by officers from the CRASH unit, the Ninth Circuit assessed his potential liability, not as a direct tortfeasor, which he clearly was not, but as a supervisor whose own conduct might give rise to Section 1983 liability. *Larez*, 946 F.2d at 646. The Court observed that supervisors may be held liable where their failure to meet their supervisorial responsibilities is a proximate cause of the constitutional injury.[12] Thus, it is clear that, by citing to *Larez*'s discussion of supervisorial liability, the *Cunningham* Court meant to apply supervisorial liability principles in analyzing the conduct of individual members of the City Council.

To succeed on a claim of supervisory liability, plaintiff must establish that defendants were directly responsible for overseeing the performance of the wrongdoer. *See Larez*, 946 F.2d at 645–46; *see also Haynesworth v. Miller*, 820 F.2d 1245, 1262 (D.C.Cir.1987). Further, the plaintiff's evidence must show that the supervisor conducted himself in a way that establishes deliberate indifference to the

wrongdoer's actions and that there is a close relationship between the alleged supervisorial indifference and the violation of plaintiff's constitutional rights. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d at 453; *Sample v. Diecks*, 885 F.2d 1099, 1118 (3rd Cir.1989); *Larez*, 946 F.2d at 645–46. The purpose of these requirements, as *Monell* and its progeny teach, is to insure that defendants are held liable only for their *own* wrongdoing, and not for the misconduct of others. *See* Section V.B., *infra.*[13]

Thus, the Court must consider whether the City Council bears a relationship to the police officers such that it can be said to "supervise" them as that term is used in Section 1983 jurisprudence. The second but related question is whether the actions of the Council in assessing requests for indemnification constitute actions in that supervisorial role. Since the Court concludes that neither of these elements is present in this case, the Court need not inquire further into questions of deliberate indifference.

**2. The City Council Does Not "Supervise" The LAPD**

While there may be circumstances under which a city council might be said to act as

**11.** This case was also brought by the same plaintiff's counsel as *Trevino, Cunningham,* and the case at bar.

**12.** The basis for such liability is the same as the basis for imposing municipal liability, as noted by the Fifth Circuit:

The most important difference between *City of Canton* and this case is that the former dealt with a municipality's liability whereas the latter deals with an individual supervisor's liability. The legal elements of an individual's supervisory liability and a political subdivision's liability, however, are similar enough that the same standards of fault and causation should govern.

*Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir.)(en banc), *cert. denied sub nom, Lankford v. Doe*, 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994); *see generally* 1B Schwartz § 7.19, at 116 (compiling cases on the subject of supervisory liability). Thus, the Fifth Circuit concluded, "We see no principled reason why an individual to whom the municipality has *delegated responsibility to directly supervise the employee* should not be

held liable under the same standard. Other circuits have reached substantially the same result." *Doe*, 15 F.3d at 453 (emphasis added).

**13.** While the cases regarding liability for indemnification decisions focus on whether the City Council can be liable for the constitutional torts of police officers, the Court pauses here to consider a second question of vicarious liability that has yet to be addressed— whether Council members sued in their individual capacities can be held liable for the actions of the public entity itself. In rejecting vicarious liability theories in Section 1983 suits, *Monell* and its progeny implies that this kind of "reverse" respondeat superior liability is not cognizable. To hold otherwise would make the individuals liable not simply for their own indemnification decisions, but for the decisions of their fellow Council member colleagues as well as of members who served on previous, and possibly subsequent, Councils. The Court is aware of nothing in Section 1983 jurisprudence that would allow for such a result.

"supervisors" of police officers,[14] this is not such a case. The Court concludes that *Larez* is not applicable with respect to the Council's decisions regarding indemnification of punitive damage awards because the Council members do not directly supervise police officers in general, and cannot be said to have supervised Officers Perez and Durden in particular.

The LAPD is a large metropolitan police agency consisting of more than 8,000 officers.[15] It is headed by a Chief of Police with an executive staff consisting of two assistant chiefs, several deputy chiefs and approximately 17 commanders. It is organized into four bureaus and multiple areas or "divisions." There are multiple levels of supervision within the department, beginning with the Watch Commander on each shift within each division, up through the department's executive staff and the Chief. The department is ultimately under the control and oversight of the civilian Board of Police Commissioners ("the Police Commission").[16] In this structural hierarchy, the City Council has no day-to-day authority over the department.[17] Thus, the Council cannot be said to exercise supervisorial responsibility over the department and its officers as that concept

has been developed in Section 1983 jurisprudence.

### 3. The Council's Decisions Under California Government Code Section 825(b) Are Not Supervisorial

■ The *Cunningham* decision equates the Council's role in assessing civil rights judgments and claims for indemnification with direct supervision. In doing so, the opinion fails to consider the nature of the Council's role and obligations in carrying out its duties under state law.

*Trevino II* makes quite clear that, in indemnifying a police officer, the Council is performing a legitimate function under state law, and that it is performing that function, if at all, long after alleged police misconduct has occurred. By the time the matter is before the Council, the misconduct has been investigated, a civil action has been instituted, the case has been tried to a verdict, and damages have been awarded against a police officer. The Council members have exercised no supervision over the wrongdoer at any stage of this process. Thus, the question is whether the Council exercises some sort of attenuated forward-looking supervision over the entire department by evaluating in-

14. For example, if a city council or its equivalent is involved in the investigation and review of complaints against officers, then the direct supervisorial connection is established. *See, e.g., Harris v. City of Pagedale,* 821 F.2d 499 (8th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987) *reh. denied,* 484 U.S. 1083, 108 S.Ct. 1066, 98 L.Ed.2d 1027 (1988). (aldermen involved in several investigations of sexually predatory police officer and who concluded that allegations against him were true, but took no action prior to the incident giving rise to the lawsuit, held responsible on supervisorial liability theory). This is more likely to occur in small towns and municipalities than in large cities where some sort of police commission exercises civilian oversight of the police department. *See also Sanders,* 794 F.2d 478.

15. In connection with the following discussion, the Court takes judicial notice of the contents of the Christopher Commission Report referenced in *Cunningham* and on which *Cunningham* placed substantial reliance in

determining that City Council members do not have qualified immunity. *See Gemtel Corp. v. Community Redevelopment Agency,* 23 F.3d 1542, 1544 n. 1 (9th Cir.1994)(court may consider matters of public record on motion to dismiss).

16. Even *Cunningham* refers to the Police Commission as the "police policy-making defendants" to distinguish it from other groups, including the City Council defendants. 989 F.Supp. at 1264.

17. The size and complexity of the LAPD, its management structure, the role of the Police Commission in overseeing the department, and the lack of Council involvement in the day-to-day operations of the department are in sharp contrast to the organization and operation described in *Pagedale,* n.15, *supra,* where an officer on a small town police force and his misconduct toward citizens of that community were known to, and investigated by, the local elected officials.

demnification requests. *Cunningham* answered that question in the affirmative and suggests that the Council must either refuse to consider indemnification requests or adopt a policy of denying such requests. However, to suggest that the Council must follow either of those two courses to the exclusion of any others ignores the Council's duties under *California Government Code* Section 825(b).

Moreover, whenever a request for indemnification is presented, the Council has before it a situation in which (usually) a Los Angeles citizen—one of its constituents whose interests the Council members were elected to represent—has been injured by an employee of the City. In such circumstances, it will almost always be the case that, if the citizen's injury resulted in an award of punitive damages, the constitutional injury was serious. A blanket policy of refusing to indemnify the officer under these circumstances means that an innocent citizen who has been victimized by the police will not, in the typical case, collect on his or her judgment. The *Trevino II* court briefly alluded to this prospect:

> Were we to find ratification [through indemnification], our holding would fly in the face of *Cornwell* by indirectly finding that a municipality's payment of punitive damages under Cal. Govt.Code § 825(b) violates federal law. *Cornwell,* 896 F.2d at 399. *Further, such a holding would deter any municipality from choosing to pay victims of constitutional violations, thus thwarting the very purpose of section 1983.*

99 F.3d at 921 (emphasis added); *see also Cornwell,* 896 F.2d at 400 ("If § 1983 were construed to prohibit a municipality from paying punitive damages, there would be occasions when civil rights plaintiffs would go unsatisfied because the individual defendants lack the assets to pay.")

In other words, unlike the Police Commission, the Chief of Police, or subordinate LAPD managers whose job is to assure that police officers perform their jobs in a competent and lawful manner, the Council must, under the law, engage in a balancing process in which there are competing interests in issue. As such, characterizing this role as "supervisorial" under Section 1983 jurisprudence is like trying to place a square peg into a round hole; with enough brute force it can be done, but not without serious damage to both peg and hole.

In sum, the imposition of supervisorial liability on individual Council members finds no support in the law because the Council members do not stand in a direct supervisorial relationship to members of the LAPD, and because their role in assessing requests for indemnification is not a supervisorial act under Section 1983 jurisprudence.

B. *The City Council's Indemnification Decisions Do Not Bear A Sufficiently Close Connection To Future Constitutional Violations To Give Rise To A Section 1983 Lawsuit*

■ Even if the Council could be said in some sense to supervise the LAPD through indemnification decisions, those decisions are not sufficiently connected to future constitutional torts to permit the suit to go forward. Allowing plaintiffs to pursue such a theory would be inconsistent with the Supreme Court's repeated admonition that there must be a clear causal connection between the conduct of the defendant and the alleged constitutional violation. Ultimately, the *Cunningham* analysis ignores this warning in reaching its conclusion. A survey of the Supreme Court's discussion of this issue is instructive.

1. *Monell and Its Progeny* [18]

Since *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611

---

18. Although this is a supervisorial liability case, the municipal liability cases are instructive since, as the Court in *Doe v. Taylor Indep.* *School Dist.,* 15 F.3d at 453, noted, municipal and supervisorial liability are based on the

(1978), the Supreme Court has emphasized that Section 1983 liability of those other than the direct tortfeasor must be based on actions of the supervisory or municipal decision-maker defendant. Thus, in *Monell*, the Supreme Court concluded that a Section 1983 claim against a municipality was actionable only where the municipality had established a policy that violated the plaintiff's constitutional rights. *Id.; see also Springfield v. Kibbe*, 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38) ("It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality decision-makers may be held liable under § 1983.") Absent proof of such a policy, a plaintiff cannot recover against a municipality for constitutional violations resulting from the acts of its agents or employees. The Court expanded on this notion in subsequent decisions defining the scope of *Monell*.

In *City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), the Supreme Court revisited *Monell* in a case involving allegations that the city failed to train and supervise a city police officer. The Supreme Court wrote:

> The foregoing discussion of the origins of *Monell*'s "policy or custom" requirement should make clear that, at the least, that requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers.

*Id.* at 821, 105 S.Ct. at 2435. The Court then took up plaintiff's assertion that, under *Monell*, a single egregious act by a police officer could give rise to municipal liability based on an inference of inadequate screening and training of police officers:

> The "policy" of the New York City Department of Social Services that was challenged in *Monell* was a policy that

same principles and share the same limita-

by its terms compelled pregnant employees to take mandatory leaves of absence before such leaves were required for medical reasons; this policy in and of itself violated the constitutional rights of pregnant employees by reason of our decision in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). Obviously, it requires only one application of a policy such as this to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.

> Here, however, the "policy" that respondeat seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.

*Id.* at 822, 105 S.Ct. at 2435

The Supreme Court therefore rejected the analysis of the lower court, which had permitted a jury instruction allowing an inference of inadequate training and supervision, as well as causation, arising from a single incident, and noted:

> [S]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter. Obviously, if one retreats far enough from a constitutional violation some municipal "policy" can be identified behind almost any such harm inflicted by a municipal official; for example, [the accused officer] would never have killed Tuttle if Oklahoma City did not have a "policy" of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was "caused" by the municipal "policy." At the very least there must be an affirmative link between the policy and the

tions. *See* n. 14, *supra*.

particular constitutional violation alleged.

Here the instructions allowed the jury to infer a thoroughly nebulous "policy" of "inadequate training" on the part of the municipal corporation from the single incident described earlier in this opinion, and at the same time sanctioned the inference that the "policy" was the cause of the incident. Such an approach provides a means for circumventing *Monell*'s limitations altogether.

*Id.* at 823, 105 S.Ct. at 2436.

Even in later decisions allowing for municipal liability where the plaintiff made a showing that the municipality was deliberately indifferent to the adequacy of the training and supervision of police officers, the Court emphasized the limited scope of this basis for Section 1983 liability:

Moreover, for liability to attach in this circumstance *the identified deficiency in a city's training program must be closely related to the ultimate injury.* Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.

*City of Canton*, 489 U.S. at 391, 109 S.Ct. at 1206 (emphasis added). Explaining the reasons for establishing the deliberate indifference standard, the Court wrote:

*Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities—a result we rejected in Monell, 436 U.S., at 693–694, 98 S.Ct., at 2037.*

*Id.* at 392, 109 S.Ct. at 1206 (emphasis added).

These and other cases in the *Monell* line emphasize that there is no respondeat superior liability for municipalities or supervisors, that Section 1983 liability must therefore be premised on the act of the municipality or supervisor, and that there be a close connection between the act and the alleged constitutional deprivation so that the act in dispute can reasonably be said to be the "moving force" behind the constitutional deprivation. *See Monell*, 436 U.S. at 694–95, 98 S.Ct. at 2038. It is not sufficient to allege the existence of some nebulous policy whose connection to the alleged injury is dubious at best. "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged," or the case cannot go forward. *Tuttle*, 471 U.S. at 823, 105 S.Ct. at 2436.

Applied to this case, the principles enunciated by the Supreme Court require an assessment of whether the Council's indemnification decisions can be said to be sufficiently "closely related to the ultimate injury" to constitute the "moving force" behind the constitutional violations in dispute. *Cunningham* assumed this to be true without either independently analyzing the element or acknowledging *Trevino II*'s contrary conclusions on that subject.

### 2. The Trevino II Opinion Is Consistent With Monell's Causation Requirement

The *Trevino II* Court based its holding that the Council member defendants could raise the qualified immunity defense in part on the lack of a causal connection between the alleged policy and the alleged constitutional tort. Citing to two cases from the Northern District of Illinois, the Court noted that "cases from other jurisdictions have held that a punitive damages indemnification policy could not cause a constitutional deprivation. *Ekergren v. City of Chicago*, 538 F.Supp. 770, 772–73 (N.D.Ill.1982); *Brown v. City of Chicago*, 573 F.Supp. 1375, 1379 (N.D.Ill.1983)." 99 F.3d at 917.

In *Ekergren*, which arose on motion to dismiss, the district judge noted:

The mere existence of a municipal policy is not enough to impose liability under § 1983 ...

Plaintiff must allege that the policy in question caused the constitutional tort.

"The touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." [Citation.] "Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent." [Citation.] 538 F.Supp. at 772; *see also Cornwell*, 896 F.2d at 400 (finding that indemnification of punitive damage awards is not per se violation of § 1983).[19]

The district court then turned to the issue before it: whether the city's past practice of providing officers with free legal representation and indemnifying them against damage awards for civil rights violations caused police misconduct. The city argued that the allegations failed to "establish either a municipal policy or the element of causation." 538 F.Supp. at 771–72. Drawing all inferences in favor of the plaintiff, the *Ekergren* Court found that the conclusory allegation that the policy of indemnification promoted constitutional violations was *"not reasonable because there are too many variables involved."* [20] *Id.* at 773. (emphasis added); *see also Brown v. City of Chicago*, 573 F.Supp. 1375 (N.D.Ill.1983). *Ekergren*, therefore, stands for the proposition that, as a matter of law, the decision to indem-

nify is too far removed from the underlying illegal act to permit suit to go forward on the theory that indemnification causes constitutional violations.

The conclusions of the *Trevino II* Court and of the cases on which it relied are entirely consistent with the *Monell* line of Supreme Court jurisprudence and are persuasive in the present context. The Council makes its indemnification decisions long after a constitutional tort has been committed by an officer over whom the Council had neither supervisorial authority or control. With all of the variables that bear on the conduct of police officers performing their duties, it is not reasonable to permit an inference that Council members, who are performing their duties under a patently constitutional state law, cause police officers to misbehave in future encounters with members of the community. Any policy regarding the indemnification of punitive damage awards in past cases is far too nebulous and too far removed from the alleged constitutional deprivation to conclude that an affirmative link could be established between the policy and future constitutional violations.

### 3. In Light of More Powerful and More Immediate Deterrents, the Decision To Indemnify Is Too Attenuated To Impose Liability

The *Ekergren* analysis is even more persuasive considering that other more pow-

---

19. *Cornwell* was a case in which the plaintiff tried to prevent the city from paying the award, insisting that the individual officers should be forced to pay the judgment. The Ninth Circuit observed that Section 1983 creates a right in the successful plaintiff to recover damages, and that California could not establish a scheme to defeat that objective. 896 F.2d at 399. The Court rejected plaintiff's argument that the city could not pay the punitive damages award, concluding that *California Government Code* Section 825(b) was not at odds with federal law. The Court held that, as a matter of law, nothing in § 1983 precludes indemnification of punitive damages awards:

> We find no federal law prohibiting California cities from acting under the authority

conferred by the California legislature. When Congress has wanted to prohibit payment of damages on behalf of one person by another it has known how to do so with express language. [Citation] Congress has enacted no such provision here.

896 F.2d at 400.

20. Plaintiff alleged that the increasing amount of civil rights litigation established a cause and effect relationship. The court disagreed, noting that, for example, the indemnification policy could lead to more litigation because plaintiffs would not be deterred from bringing suit by the fact that the individual officer might be judgment proof. *Ekergren*, 538 F.Supp. at 773.

erful deterrents have been ineffective in preventing the police misconduct in issue. The indemnification theory is based on the premise that police officers, in dealing with suspects or with innocent citizens who have done no wrong, are motivated in significant part in those dealings by concerns over their own personal finances. Stated somewhat differently, the theory assumes that people who choose a job where their lives could be placed in danger at any moment would tend toward caution in their encounters with civilians on the basis of their personal financial concerns. Particularly in the case of officers prone to misconduct, this theory: (a) fails to account for the complex motivations behind the officers' behavior; (b) underestimates the officers' ability and willingness to rationalize their conduct; and (c) overestimates the deterrent effect of remote consequences.[21] The facts of this case help to illustrate this point.

Here, plaintiff Hernandez was allegedly the victim of *criminal* misconduct by officers Perez and Durden. The officers allegedly falsified the evidence against Hernandez and obtained a conviction. The conviction was overturned based on a writ of habeas corpus sought by the District Attorney's office after Perez reportedly confessed, in connection with a plea bargain, to this and other crimes. Thus, in hindsight it is now clear that even the possibility of criminal prosecution failed to deter police misconduct by Perez and, reportedly, by a number of his Rampart Division colleagues.[22] If, as appears to be

the case, the threat of criminal prosecution and imprisonment failed to prevent civil rights abuses of the sort now before this Court, it is not reasonable to assume that a remote decision by the City Council regarding indemnification of civil penalties would have had any impact whatsoever on their conduct. In view of these circumstances, no persuasive argument can be made that the actions of the City Council were the "moving force" behind the constitutional deprivation. *Monell*, 436 U.S. at 694–95, 98 S.Ct. at 2038.

C.  *Cunningham's "Good Faith" Inquiry Conflicts With The Policies Articulated in Harlow and Monell*

*Harlow* expresses the importance of resolving disputes against municipalities and municipal employees at the earliest possible time to minimize disruption of their functions where a case should not proceed to trial; *Monell* and its progeny emphasize the importance of a close connection between policies and constitutional deprivations to minimize the intrusion of the federal courts into legitimate local activities. Considering the evidence the court found relevant, it is clear that the *Cunningham* decision serves neither of these policies.

As noted above, *Cunningham* concluded that a Section 1983 trial of City Council members would require an assessment of whether, in specific instances where indemnification was approved, the Council member voted in favor of approval in "good faith," a standard that the opinion does not define. Whatever the standard

**21.** An internal discipline system that often seems indifferent to citizen complaints is likely to have much greater impact on officer behavior. Even as this opinion was being drafted the *Los Angeles Times* reported on a case where the LAPD "investigated" a report of false statements in an arrest report, failed to interview percipient citizen witnesses and exonerated the officers who were later found by the District Attorney's Office to have falsified the arrest report in issue. Scott Glover & Matt Lait, *Evidence Contradicts LAPD Arrest Report, L.A. Times*, May 18, 2000, Section A.

**22.** In Los Angeles, the potential for criminal liability is real. For example, in 1992, four Los Angeles police officers were indicted for violating the constitutional rights of Rodney King. The officers in that case, which involved less serious misconduct than the misconduct reportedly engaged in by Officers Perez and others, were convicted in April 1993 and sentenced to 30 months' imprisonment. *See Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Yet, even the knowledge of the consequences that befell their colleagues failed to deter the officers' misconduct in this case.

means, it is clear that an assessment of a Council member's vote would necessarily involve mini-retrials of all of the cases in which the Council was called on to assess an indemnification request. That is, *Cunningham*'s reasoning necessarily leads to the following sort of inquiry.

To reach the question of the Council's good faith, a jury in this Section 1983 case (the "current jury") first would have to determine whether there was a policy or practice of indemnifying punitive damage awards in existence prior to the events giving rise to the case before it. If the current jury so found, it would next have to review the evidence presented to the juries in each case in which punitive damages were awarded to understand the nature and scope of the conduct at issue in each one of those cases. After that inquiry, the current jury would have to review the City Council's review of each of those cases to determine the nature and scope of the Council's actions with respect to each of those cases. With that information, the current jury would then need to: (1) conduct its own assessment of each case presented to the Council to assess the merits of the case and the basis of the punitive damage award; (2) conduct its own assessment of the Council's assessment of each of those cases and the punitive damage award; and (3) determine whether the Council's assessment, viewed with $^{20}/_{20}$ hindsight, meets the as yet uncertain "good faith" standard enunciated in *Cunningham*.[23] Once that was accomplished, the current jury would assess other evidence to determine whether the conduct of the City Council, if found to be in bad faith, caused the violation of civil rights in the Section 1983 case. In short, Section 1983 litigation would be turned into a hopelessly cumbersome process focused not on compensating citizens for deprivations of their rights, but rather on conducting a judicial review of City Council indemnification decisions to determine whether they complied in good faith with state law.

Such a proceeding does not comport with the objectives of *Harlow,* which encourages early resolution of claims against governmental officials who reasonably believe that they are not violating any constitutional principle, or with the entire thrust of Section 1983 jurisprudence which discourages an overly intrusive federal presence in the operation of local government. The observations of the Supreme Court in *City of Canton* are particularly pertinent. Emphasizing the narrow scope of its holding, the Supreme Court noted the critical importance of requiring a high standard of culpability and an affirmative causal link in cases where there is no express policy that, on its face, violates the constitution:

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. *See Oklahoma City v. Tuttle,* 471 U.S., at 823, 105 S.Ct. at 2436 (opinion of REHNQUIST, J.). Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault [than deliberate indifference] would result in de facto respondeat superior liability on municipalities—a result we rejected in *Monell,* 436 U.S., at 693–694, 98 S.Ct., at 2037. *It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism. Cf. Rizzo v. Goode,* 423 U.S. 362, 378–380, 96 S.Ct. 598, 607–608, 46 L.Ed.2d 561 (1976).

---

23. Even this analysis is oversimplified as plaintiff here sues individual Council members. The current jury would actually have to review each decision by each Council member to determine if he or she acted in good faith, and then somehow apportion fault based on each individual's conduct.

*Canton,* 489 U.S. at 392, 109 S.Ct. at 1206 (emphasis added).

The inquiry proposed in *Cunningham* would result in just the sort of judicial second-guessing criticized in *Canton.* If the Supreme Court was concerned about judicial intrusion into the training programs of local police departments, this Court believes that it would be even more concerned about Section 1983 litigation that would require judicial review of City Council's considerations of indemnification requests under a constitutional state statute. Injecting the federal courts into this legitimate, constitutional process implicates serious questions of federalism. *Rizzo v. Goode,* 423 U.S. 362, 380, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976)(principles of federalism prevent federal court from "inject[ing] itself by injunctive decree into the internal disciplinary affairs of [a] state agency"). In view of Supreme Court precedent, this Court concludes that the holding in *Cunningham* would permit the prosecution of lawsuits which are far beyond the scope of litigation contemplated under Section 1983.

### D. *Section 1983 Does Not Apply to Violations of State Laws*

Finally, Cunningham may be read to mean that a violation of *California Government Code* Section 825(b) gives rise to a Section 1983 lawsuit. As noted above, the *Cunningham* Court stated in pertinent part:

> After the Christopher Commission Report and *Trevino,* a jury could find that the council members *knew or should have known that there was a very high risk that they'd be indemnifying officers who were committing acts of excessive and deadly force. Trevino cannot be read to say that it is acceptable for the council member defendants to ignore such information and, in fact, it is clear law under Larez that they cannot ignore such information.*

989 F.Supp. at 1274 (emphasis added). Thus, it appears that, without a showing that a policy of indemnifying police officers causes *future* civil rights violations, both *Cunningham* and the plaintiff here would have the City Council be held liable under Section 1983 for failing properly to apply *California Government Code* Section 825(b) to its indemnification decision. But even if the indemnification of officers for acts of deadly and excessive force could be shown to have violated state law in some specific instance, that is insufficient to permit a lawsuit under Section 1983. Section 1983 only imposes liability for violations of rights protected by the Constitution or *federal* statutes, not for violations of state law. *See Ting v. United States,* 927 F.2d 1504, 1511 (9th Cir.1991). Since the Court finds no basis for concluding that the conduct in issue violates federal law, the fact that it might violate state law is of no consequence under Section 1983.

## VI.

## CONCLUSION

"Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity." *Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1149 (11th Cir.1994). For the reasons set forth above, this Court finds that this case has not presented "exceptional" circumstances sufficient to strip the City Council members of their qualified immunity. Accordingly, Section 1983 suits against City Council members based on their decision to indemnify police officers for their punitive damages awards are not, and ought not to be, cognizable, and the Council members are thus dismissed with prejudice from this case.

IT IS SO ORDERED.